JOURNAL ENTRY AND OPINION.
{¶ 1} Defendant-appellant Nasir Muntaser ("Muntaser") appeals his sentence and convictions for one count of murder, seven counts of aggravated arson, and one count of arson. Finding no merit to the appeal, we affirm.
 {¶ 2} At trial, the following evidence was presented:
 {¶ 3} Muntaser was the owner of Nick's Superette, a convenience store located at 466 East 125th Street. In January 2000, after losing his food stamp license, Muntaser hired Ali Alnajada ("Alnajada") to operate the store, and he put the store in Alnajada's name so that they could obtain a new food stamp license. Although the store and all of the store's accounts, licenses, and other documents were in Alnajada's name, the two men had a separate agreement whereby Alnajada agreed to lease the store while Muntaser remained the true owner. Pursuant to this agreement, Alnajada agreed to pay Muntaser $1,000 per month for rent. Although Alnajada never signed the agreement, he made these payments for over a year.
 {¶ 4} Notwithstanding the fact that Alnajada obtained a new food stamp license, the business continued to suffer financially. When the food stamp license was later revoked because Alnajada was exchanging stamps for cash, business worsened. Eventually, Muntaser decided "he wanted to be done with it." Muntaser told Alnajada he was going to set the store on fire to collect the insurance money and promised to give him $5,000 from the proceeds.
 {¶ 5} During the summer of 2001, Muntaser obtained an insurance policy for the store which included $55,000 coverage for fire loss. As the legal owner of the store, Alnajada signed the insurance papers. Muntaser made the first premium payment and Alnajada made two subsequent payments.
 {¶ 6} In January 2002, Muntaser made plans to set the store on fire. Alnajada testified that Muntaser hired Tayser Marzouk ("Marzouk") to set the fire. Muntaser met Marzouk at the store four days before the fire to discuss the plan and give him a key to the store. Muntaser also staged a break-in by cutting a hole in the wall in an attempt to establish the appearance of neighborhood animosity for the store and to create a perceived motive for the arsonist. Following Muntaser's instruction, Alnajada threw the cash register on the floor and scattered money to make it look like a burglary. On Muntaser's instruction, Alnajada reported the "burglary" to the police, who responded to the store and investigated the alleged crime.
 {¶ 7} Meanwhile, Marzouk called Anthony Pascol ("Pascol"), an acquaintance who had performed carpentry work for him, and asked him to help move inventory from the store. Pascol, believing Marzouk was the owner of the store, agreed to help.
 {¶ 8} On the night of January 22, 2002, Marzouk and Pascol entered the store. According to Pascol, Marzouk unlocked the door with a single key. After loading items from the store into Marzouk's van, Pascol went outside and drank a beer with a woman from the neighborhood. When Pascol went back inside the store, he observed Marzouk spreading gasoline on the floor. Pascol testified that he not only saw the large red can containing the gasoline, but he also noticed the strong fumes. Pascol further testified that Marzouk never told him there would be a fire at the store.
 {¶ 9} Pascol asked Marzouk what he was doing. Before Marzouk could answer him, there was an explosion. Pascol managed to escape, but suffered serious burns. Marzouk died in the explosion and resulting fire. The fire also caused considerable damage to the neighboring duplex where two men lived.
 {¶ 10} Det. Mark Wright of the Cleveland Arson Unit investigated the fire and concluded that it was intentionally set. He found evidence that an accelerant such as gasoline was used to set the fire. While cleaning up the debris from the fire, investigators found a five-gallon gas can which smelled of gasoline. Expert testimony from the Cleveland Arson Unit opined that gasoline fumes, being heavier than air, most likely traveled down to the basement of the building and ignited when the fumes met the pilot light in the water heater, causing the explosion.
 {¶ 11} The fire investigators questioned Alnajada about the fire. Although he originally denied any knowledge of the fire, he was arrested after he failed a polygraph test. His brother convinced him to cooperate with the police and Alnajada made a full confession. He also agreed to wear a wire and meet with Muntaser. In a taped conversation, Muntaser discussed the crime and admitted that he had given a key to Marzouk. Muntaser also assured Alnajada that the staged break-in would explain why one of the keys to the store was missing.
 {¶ 12} Following the taped conversation, Muntaser was arrested and charged in a nine-count indictment alleging one count of murder, seven counts of aggravated arson, and one count of arson. A jury returned guilty verdicts on all nine counts. In October 2002, the court sentenced Muntaser to fifteen years to life for murder, one year for the arson charge, and eight years for each count of aggravated arson, to run concurrently to the arson sentence. However, three of the prison terms for aggravated arson were ordered to run consecutively to the other counts of aggravated arson and the murder count. Muntaser appealed, raising ten assignments of error.
Felony Murder Charge
 {¶ 13} In his first assignment of error, Muntaser argues the trial court erroneously gave an ambiguous instruction on felony murder. However, Muntaser never objected to the jury instructions. "Failure to object to a jury instruction constitutes a waiver and any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." State v. Underwood (1983),3 Ohio St.3d 12, syllabus. See, also, State v. Williford (1990),49 Ohio St.3d 247, 251.
 {¶ 14} Muntaser has failed to show that the jury instructions constituted plain error. The court charged the jury that to convict Muntaser of murder, it had to find that:
"the defendant caused the death of Tayser Marzouk as a proximateresult of the offender committing or attempting to commit an offense ofviolence that is a felony of the first or second degree."
 {¶ 15} The single count of arson alleged in the indictment was a felony of the third degree. Muntaser argues that because the court did not inform the jury that "arson" was a third degree felony, it is possible the jury impermissibly relied on that one arson count as the basis for the murder conviction.
 {¶ 16} However, Muntaser ignores the fact that the court further instructed the jury that before they could find Muntaser guilty of murder, it would have to find the defendant guilty of aggravated arson. Specifically, the court explained:
"Before you can find the defendant committed the offense of murder,you must find beyond a reasonable doubt that the defendant committed anyone of the offenses captioned aggravated arson as charged in Counts One,Two, Three, Four, Six, Seven and Eight." (Tr. 1711).
 {¶ 17} Depending on the allegation in each individual count, the level of the aggravated arson offense was either a first or second degree felony. Thus, this instruction effectively eliminated arson as a possible basis for the murder conviction. Therefore, Muntaser's claim that the jury could have impermissibly relied on the arson count for the murder conviction is simply unfounded.
 {¶ 18} Muntaser also argues that because the court never defined the term "the offender," the jury instructions were confusing. Muntaser also argues that the court's utilization of the definite article "the" in the phrase, "the offender" improperly refers to a single individual and suggests that individual is the defendant, Muntaser. In support of this argument, Muntaser cites two pages of the transcript where the phrase "the offender" was used.
 {¶ 19} However, throughout the entire charge, the court specifically referred to Muntaser as "the defendant." Although the court utilized the term "the offender" on two occasions, neither use of the term could have confused or misled the jury.
 {¶ 20} The court first used "the offender" phrase when it defined "murder." Specifically, the court stated:
"`Murder' is causing the death of another as a proximate result of theoffender's committing or attempting to commit an offense of violence."
 {¶ 21} In this definition, "the offender" refers to anyone who causes the death of another while committing or attempting to commit an offense of violence. In this instance, the term "the offender" is used as a generic term and there is nothing to suggest that it referred solely to Muntaser.
 {¶ 22} The court used "the offender" phrase a second time as it was further explaining the concept of felony murder:
"Before you can find the defendant guilty of murder, you must findbeyond a reasonable doubt that on or about the 22nd day of January,2002, and in Cuyahoga County, Ohio, the defendant caused the death ofTayser Marzouk as a proximate result of the offender committing orattempting to commit an offense of violence that is a felony of the firstor second degree."
 {¶ 23} In this instance, "the offender" refers to "the defendant," Muntaser. However, there is nothing prejudicial about this instruction. The instruction simply explains to the jury that it may not find Muntaser guilty of murder unless they also find beyond a reasonable doubt that he caused the victim's death as a proximate result of his committing or attempting to commit an offense of violence. The court could have substituted "the defendant" for "the offender" without prejudicing Muntaser. This instruction was simply a definition of felony murder and did not in any way suggest that Muntaser is "the offender." Therefore, we find that Muntaser's argument that "the offender" phrase was somehow prejudicial and constituted plain error is without merit.
 {¶ 24} Finally, Muntaser argues he should not have been convicted of felony murder because the victim's death was not contemplated by anyone and the evidence clearly showed that Muntaser was not on the premises when the fire started. However, the fact that Marzouk's death was not part of the plan does not prevent the jury from convicting Muntaser for Marzouk's death.
 {¶ 25} Under Ohio's felony murder doctrine, a defendant can be held liable for a death that results from the actions of his co-felon.State v. Washington, Cuyahoga App. No. 79300, 2002-Ohio-505. R.C.2903.02(B) provides:
"No person shall cause the death of another as a proximate result ofthe offender's committing or attempting to commit an offense of violencethat is a felony of the first or second degree and that is not aviolation of section 2903.03 or 2903.04 of the Revised Code."
 {¶ 26} In State v. Dixon, Montgomery App. No. 18582, 2002-Ohio-541, the court explained that under the "proximate cause theory" of felony murder:
"[I]t is irrelevant whether the killer was the defendant, anaccomplice, or some third party such as the victim of the underlyingfelony or a police officer. Neither does the guilt or innocence of theperson killed matter. A defendant can be held criminally responsible forthe killing regardless of the identity of the person killed or theidentity of the person whose act directly caused the death, so long asthe death is the `proximate result' of defendant's conduct in committingthe underlying felony offense; that is, a direct, natural, reasonablyforeseeable consequence, as opposed to an extraordinary or surprisingconsequence, when viewed in the light of ordinary experience. Id; Statev. Bumgardner, Greene App. No. 97-CA-103, 1998 Ohio App. LEXIS 3856;State v. Lovelace (1999), 137 Ohio App.3d 206."
 {¶ 27} Thus, a defendant may be held criminally liable for the unintended death that results from the commission of a first or second degree felony. Under R.C. 2909.02(B), aggravated arson is a felony of either the first or second degree depending on the facts alleged in the indictment.
 {¶ 28} Further, R.C. 2923.03(E) provides that an accomplice "shall be prosecuted as if he were the principal offender."
 {¶ 29} In the instant case, the State used aggravated arson as the predicate offense to support the felony murder charge. The instruction on complicity, which Muntaser has not challenged, allowed the jury to find Muntaser guilty of murder if they believed him to be an accomplice to an aggravated arson. Therefore, we find Muntaser's argument that he should not have been found guilty of murder because he never contemplated Marzouk's death and because he was not present at the time of the fire to be without merit.
 {¶ 30} Accordingly, the first assignment of error is overruled.
Basis for Felony Murder
 {¶ 31} In his second assignment of error, Muntaser reiterates the same argument from his previous assignment of error that the trial court erroneously failed to expressly exclude arson as a possible predicate basis for the felony murder charge. However, as previously noted, the trial court specifically instructed the jury that they could not find Muntaser guilty of murder unless they also found him guilty of one of the aggravated arson counts. Therefore, this argument is unfounded.
 {¶ 32} Muntaser also argues that the evidence does not support the crime of aggravated arson because there was no evidence that the building that burned was an "occupied" structure. R.C. 2909.02(A)(3), the aggravated arson statute, provides in pertinent part:
"No person, by means of fire or explosion, shall knowingly do any ofthe following:
 * * *
 (3) Create, through the offer or acceptance of an agreement for hire orother consideration, a substantial risk of physical harm to any occupiedstructure."
 {¶ 33} Here, the neighboring duplex was placed at substantial risk of physical harm and suffered considerable damage. The two men who lived in the duplex were also named as victims in two of the charges brought against Muntaser. Therefore, the fact that Nick's Superette was not an "occupied" structure was inconsequential.
 {¶ 34} Accordingly, Muntaser's second assignment of error is overruled.
Sufficiency of Evidence
 {¶ 35} In his third and fourth assignments of error, Muntaser argues the verdicts finding him guilty of murder and aggravated arson were not supported by sufficient evidence because there was no evidence that he intended Marzouk's accidental death. Muntaser also argues the guilty verdicts were not supported by sufficient evidence because Marzouk's death was not a foreseeable consequence of aggravated arson.
 {¶ 36} However, Ohio's felony murder statute, R.C. 2903.02(B) does not require any purpose or specific intent to cause death. As previously stated, the court in State v. Dixon, Montgomery App. No. 18582, 2002-Ohio-541, explained that under Ohio's current felony murder statute, the defendant "can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the `proximate result' of [the] defendant's conduct in committing the underlying felony offense." Id. at 5. The Dixon court further held that, pursuant to the plain language of the statute, the Ohio legislature intended to adopt the proximate cause theory of felony murder. Id.
 {¶ 37} Thus, under R.C. 2903.02(B), a defendant may be held criminally liable for a death if the death was a "proximate result" of the felony. Dixon, supra, at 6. In State v. Losey (1985),23 Ohio App.3d 93, the court observed that, as used in R.C. 2903.04, the involuntary manslaughter statute, the term "`proximate result' bears a resemblance to the concept of `proximate cause' in that [a] defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct." Id. at 95, citing State v. Chambers (1977),53 Ohio App.2d 266; see, also, State v. Lovelace (1999),137 Ohio App.3d 206, 219-220. The causation language of the felony murder statute, R.C. 2903.02(B), is the same as that chosen by the legislature in the involuntary manslaughter provisions, thus the same principles apply. Dixon, supra, at 16.
 {¶ 38} Thus, for criminal conduct to constitute the "proximate cause" of a result, the conduct must have (1) caused the result, in that but for the conduct the result would not have occurred, and (2) the result must have been foreseeable. State v. Lovelace (1999),137 Ohio App.3d 206. Foreseeability is determined from the perspective of what the defendant knew or should have known, when viewed in light of ordinary experience. Id. It is not necessary that the defendant be able to foresee the precise consequences of his conduct; only that the consequences be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by the defendant. Id; State v. Losey (1985), 23 Ohio App.3d 93.
 {¶ 39} Here, but for Muntaser's criminal conduct, i.e., hiring Marzouk to set fire to his store, the death would not have occurred. Moreover, the jury found Marzouk's death to be foreseeable. The fact that the decedent was a "professional arsonist" or that the explosion was caused by an unexpected event does not mean the death was unforeseeable. Death is a foreseeable consequence of arson. Therefore, the verdict finding Muntaser guilty of felony murder is supported by sufficient evidence.
 {¶ 40} Accordingly, the third and fourth assignments of error are overruled.
Accomplice Testimony
 {¶ 41} In his fifth assignment of error, Muntaser argues that the guilty verdicts in this case are null and void because the conviction was supported solely by the uncorroborated testimony of an accomplice. When an accomplice testifies on behalf of the State in exchange for a plea agreement, there is a possibility the accomplice's testimony may be self-serving and biased. Therefore, R.C. 2923.03(D) requires that the court give the jury a special instruction on the credibility of accomplices. In compliance with R.C. 2923.03(D), the court charged:
"The testimony of an accomplice does not become inadmissible because ofhis complicity, moral turpitude or self-interest, but admitted or claimedcomplicity of a witness may affect his credibility and make his testimonysubject to grave suspicion and require that it be weighed with greatcaution.
 It is for you as jurors, in the light of all the facts presented toyou and from the witness stand, to evaluate such testimony and determineits quality and worth or its lack of quality and worth."
 {¶ 42} In the present case, Alnajada, an accomplice, testified that Muntaser hired Marzouk to set fire to his store. Although corroboration is not necessarily required by R.C. 2923.03(D) as Muntaser claims, there is substantial evidence in the record corroborating Alnajada's testimony. There was evidence that Muntaser's store had been losing money as early as 2001 and had lost its food stamp license. Months prior to the fire, Muntaser obtained insurance for the store with $55,000 coverage for fire loss. Forensic evidence demonstrated the fire was set intentionally. Pascol testified that Marzouk used a key to unlock both locks on the store on the night of the fire. In light of all the evidence of Muntaser's guilt, any reliance the jury may have placed on Alnajada's testimony does not render the verdict null and void.
 {¶ 43} Therefore, the fifth assignment of error is overruled.
Several Alternate Predicate Crimes
 {¶ 44} In his sixth assignment of error, Muntaser argues for the third time in this appeal that the trial court erroneously failed to advise the jury that it may not rely on the one count of arson to support the murder conviction. However, as previously noted, the trial court specifically instructed the jury that they could not find Muntaser guilty of murder unless they also found him guilty of one of the aggravated arson counts.
 {¶ 45} Therefore, the sixth assignment of error is overruled.
Consecutive Sentences
 {¶ 46} In his seventh assignment of error, Muntaser argues the trial court erred when it sentenced Muntaser to consecutive sentences without placing its reasons for doing so on the record. In his eighth assignment of error, Muntaser reiterates that same argument and further claims the trial court failed to make the requisite findings under R.C.2929.14(E)(4).
 {¶ 47} In imposing consecutive prison terms for convictions of multiple offenses, the trial court must make certain findings enumerated in R.C. 2929.14(E)(4). According to this statute, a court may impose consecutive sentences only when it concludes that the sentence is (1) necessary to protect the public from future crime or to punish the offender; (2) not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) the court finds one of the following: (a) the crimes were committed while awaiting trial or sentencing, under sanction or under post-release control; (b) the harm caused by multiple offenses was so great or unusual that a single prison term would not adequately reflect the seriousness of the offense; or (c) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime. R.C. 2929.14(E).
 {¶ 48} When the trial court makes the above findings, it must also state its reasons on the record why it made the findings. State v. Gary
(2001), 141 Ohio App.3d 194.
 {¶ 49} In imposing the sentences consecutively, the trial court stated as follows:
"Sir, I am going to give you consecutive sentences and I do thatbecause I feel it is necessary to protect the public from future crimes.I feel it's necessary to punish you.
 And I also feel that it is not disproportionate to the seriousness ofconduct and not disproportionate to the danger that was posed to thecommunity.
 I feel that the harm caused was so great that no single prison termwould adequately reflect the seriousness of your crimes, and for thatreason I impose the following sentence."
 ¶ 50In support of these findings, the court explained that not only did Muntaser and Marzouk stage a break-in the day before the fire, the evidence at trial suggested that they intended Pascol, an African-American, to perish in the fire. They wanted it to look as though there was animosity between the predominantly African-American neighborhood and the Arab store owners. Having an African-American die in the fire would suggest he was the arsonist and lend credence to this theory. (Tr. 1760-1761). The court further explained that one of the victims was killed in the fire, another victim was seriously disfigured, and the lives of the two men living next door were also threatened when the fire spread to their home. The court also remarked on the "psychological harm" the fire caused to these victims. Pascol, a carpenter, is now physically unable to use certain tools necessary for his trade. The court also noted the potential harm the firefighters faced as they extinguished the fire in a building that was in danger of collapsing. Lt. Kovacic testified at the sentencing hearing that building collapse is one of the leading causes of firefighter fatalities in this country.
 {¶ 51} Finally, the court noted that Muntaser showed no remorse. Although he stated he was sorry someone died, he continued to deny any involvement in the crime despite the overwhelming evidence of his guilt.
 {¶ 52} Based on these statements, we find the court's reasons for imposing consecutive sentences supports the findings the court made pursuant to R.C. 2929.14(E)(4). We therefore find the court complied with the mandates of R.C. 2929.14(E)(4).
 {¶ 53} Accordingly, the seventh and eighth assignments of error are overruled.
Aggregate of Consecutive Sentences Exceeds Maximum
 {¶ 54} In his ninth assignment of error, Muntaser argues the consecutive sentences should be vacated because the aggregate amount of these sentences exceeded the maximum allowable sentence for Muntaser's most serious offense. However, R.C. 2929.14(E) provides at subsection (5):
"When consecutive prison terms are imposed pursuant to division(E)(1), (2), (3), or (4) of this section, the term to be served is theaggregate of all of the terms so imposed."
 {¶ 55} In other words, consecutive sentences for multiple convictions may exceed the maximum sentence for the single most serious offense. State v. Myers, Clark App. No. 2001-CA-40, 2002-Ohio-6196, citing, State v. Hacker, Clark App. No. 2001-CA-12, 2001-Ohio-1481 (expressly rejecting "any suggestion that consecutive sentences may not exceed the maximum sentence allowable for the most serious offense of which a defendant is convicted"). Accordingly, we overrule the ninth assignment of error.
Allocution
 {¶ 56} In his tenth assignment of error, Muntaser argues that the trial court violated his constitutional right to due process by denying his right to allocution. The Ohio Supreme Court has determined that Crim.R. 32(A)(1) confers an absolute right of allocution. State v. Green
(2000), 90 Ohio St.3d 352, 358; State v. Campbell (2000),90 Ohio St.3d 320, 324-325. "The purpose of allocution is to allow the defendant an additional opportunity to state any further information which the judge may take into consideration when determining the sentence to be imposed." Defiance v. Cannon (1990), 70 Ohio App.3d 821, 828.
 {¶ 57} Contrary to Muntaser's claim that the court deprived him of his right of allocution, both Muntaser's lawyers and Muntaser himself had the opportunity to address the court in mitigation of punishment and to submit a sentencing memorandum on his behalf. The court specifically asked Muntaser if he wished to make a statement, and the following dialogue occurred:
"THE COURT: Mr. Nisar Muntaser, you have a right to make a statement ifyou care to. You're not required to but if would like to, you may.
 * * *
 THE DEFENDANT: First thing I would like to do, Mr. Marzouk and Mr.Pascol, all sympathy and apology for something I swear to God I neverever did. I'm a hundred percent innocent. That's it."
(Tr. 1743).
 {¶ 58} Therefore, because the court honored Muntaser's right of allocution and gave him an opportunity to make a statement on his own behalf, the tenth assignment of error is overruled.
Judgment affirmed.
Anne L. Kilbane, P.J. and James J. Sweeney, J. Concur