[Cite as *State v. Jones*, 2016-Ohio-7702.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
Nos. 103290 and 103302

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## RANDY JONES, ET AL.

DEFENDANTS-APPELLANTS

**JUDGMENT:**
AFFIRMED IN PART; VACATED IN PART AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-13-578526-A and 13-578526-B

**BEFORE:** Jones, A.J., Kilbane, J., and Boyle, J.
**RELEASED AND JOURNALIZED:** November 10, 2016

**ATTORNEYS FOR APPELLANTS**

**For Randy Jones**

James J. Hofelich
614 W. Superior Avenue
Suite 1310
Cleveland, Ohio 44113

**For Carissa Jones**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Christoher D. Schroeder
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

ON RECONSIDERATION[1]

LARRY A. JONES, SR., A.J.:

{¶1} Defendants-appellants, Randy and Carissa Jones, appeal their convictions and ten-year sentences for involuntary manslaughter, endangering children, and permitting child abuse, which were rendered after a joint jury trial.[2]  For the reasons that follow, we affirm the convictions, vacate the sentences and remand for resentencing.

## I.  Statement of the Case

**Background**

{¶2} The victim in this case was the Joneses' 12-year-old daughter, T.J., who passed away on February 18, 2013.  The Joneses, Florida natives, adopted T.J. in Florida in 2002 when she was approximately eight months old.  They made the decision to adopt because Carissa has Lupus, an autoimmune disorder, which she was successfully managing with medication at the time she and Randy wished to start a family.  Attempting to get pregnant would have required her to go off her medications, which she did not want to do.  The family moved to Cleveland in 2006 for Randy's job.

---

[1]The original announcement of decision in *State v. Jones*, 8th Dist. Cuyahoga Nos. 103290 and 103302, 2016-Ohio-5923, released September 22, 2016, is hereby vacated.  This opinion, issued upon reconsideration, is the court's journalized decision in this appeal.  *See* App.R. 22(C); S.Ct.Prac.R. 7.01.

[2]Randy and Carissa filed separate appeals.  (8th Dist. Cuyahoga Nos. 103290 and 103302, respectively.) This court consolidated the appeals for hearing and disposition.  (Motion nos. 497480 and 497478, respectively.)

**{¶3}** Shortly after they relocated in Cleveland, T.J. was diagnosed with autism, attention deficit hyperactivity disorder ("ADHD"), and mild developmental delays. Her parents initially gave her medications to treat the issues, but eventually discontinued doing so because they believed the medications were not working. T.J. also had difficulty communicating and understanding other people. Her parents took her to a psychologist for the communication issues, but stopped doing so in 2009.

**{¶4}** T.J. saw a pediatrician in 2007 as part of her school registration, but did not see any doctors after 2009 because, according to Randy, she was "never sick." T.J. had self-injurious behavior and self-picking issues. According to Randy, he and Carissa learned from medical professionals how to deal with the issues and thereafter were able to help T.J. on their own. T.J. was also prone to developing blisters on her body. Randy, who had military experience treating injuries, tended to T.J.'s blisters. According to her parents, T.J. had a high pain tolerance.

**{¶5}** T.J. initially went to a traditional school, but her parents did not feel it was working for her and, therefore, after the second grade, Carissa, a professional-trained teacher, home schooled her. An area in the basement of the family's home was set up similar to a classroom and was where T.J. was schooled.

**{¶6}** Randy testified at trial. He told the jury that T.J. first starting getting blisters on her body when she was three or four years old; he and Carissa noticed them one day after T.J. had been in daycare. They never got a definitive answer as to why T.J. would get them, but as mentioned, Randy would treat them, and according to him, they

would generally heal in ten to 14 days. Randy testified that his treatment of the blisters involved applying a topical antibiotic (Neosporin), hydrogen peroxide, rubbing alcohol, and a mixture of "home" remedies, including a salve containing garlic and cayenne pepper. He would daily clean the wounds, and because of T.J.'s picking issues, he would also daily bandage them.

**The Days Leading up to T.J.'s Death**

{¶7} On February 10, 2013, T.J. and Carissa were both sick with colds. T.J. also had blisters on her feet. Randy and Carissa did not seek professional treatment for T.J.; they treated her at home as they had always done. However, at Randy's urging, Carissa went to an urgent care center for her cold. Randy testified that, on and off since January 2013, Carissa had been fighting a cold which caused her to cough up mucus and because of her inability to shake it, coupled with her Lupus, he urged her to seek professional medical treatment. Carissa was prescribed an antibiotic and she filled the prescription.

**T.J.'s Death**

{¶8} T.J. died on a Monday, and the Sunday immediately preceding was the NBA's All-Star Game. Randy testified that it was a family tradition to watch the game and celebrate. According to Randy, on that Sunday, T.J. was getting back to her normal self, appeared to be clear of any cold symptoms, and joined in the festivities. Randy testified that, because of the day's festivities, he did not remove the bandages on T.J. or clean her wounds that day. When T.J. went to sleep that evening she appeared to be fine, but awoke in the early morning hours, complaining of a pain in her side. Randy

thought she had probably overdone it during the festivities, so he gave her a heating pad and took her temperature, which did not indicate a fever. He laid down with her for a while, but left her room when Carissa suggested that T.J. would get more rest if he were not there.

{¶9} Randy went to sleep in another bed, but was awakened by Carissa screaming. He found Carissa in T.J.'s room; T.J. was unresponsive. Randy performed CPR on T.J., who vomitted. Carissa called 911. The 911 dispatcher testified at trial, and Carissa's call to 911 was played for the jury. The dispatcher described hearing Randy in the background, sounding "panicked," and heard him say "I knew it, I knew it." Randy testified that he said "I knew it" to mean that he knew he should not have left T.J. that morning to sleep in another bed. According to the dispatcher, although Randy was "panicked," Carissa was "calm."

{¶10} T.J. was transported by ambulance to an emergency room where, among others, Dr. Jamal Alarafi, attended to her. She passed away shortly after arriving at the hospital. Dr. Alarafi testified that he smelled necrotic, or dead, flesh on T.J. Dr. Alarafi did not remove the bandages on T.J.'s feet, but described them as "dirty," observed pus draining from T.J.'s feet, and observed an abscess on her leg. The doctor believed that it would have taken days and weeks of non-management of the wounds for them to develop to the point that they had, and that the smell would have been noticeable within one to two weeks. After viewing pictures of the wounds with the bandages removed, Dr. Alarafi admitted that they actually depicted wounds in various stages of

healing.

{¶11} Over the defense's objections, Dr. Alarafi was permitted to testify that it was his opinion that T.J. was malnourished.[3] He testified that her stomach was distended, and that she was very small and emaciated. The doctor admitted that he did not know if T.J. had always been a small child and that he did not look at any growth charts.

{¶12} In speaking with Randy and Carissa after T.J.'s death, Dr. Alarafi found Carissa to be "kind of indifferent," and found that "very strange." According to the doctor, Randy told him that T.J. had had a cold and had recently complained of chest pain, they were treating her with over-the-counter medicine, and they did not believe in modern medicine. The statement regarding disbelief in modern medicine was not reflected in the doctor's notes, however, and Randy testified that he never said that and that he and Carissa did believe in modern medicine. Dr. Alarafi also initially testified that Randy told him that T.J. had not been immunized, but later admitted, after reviewing his notes, that Randy said he was not sure whether she had been immunized; the record indicates that T.J. had, in fact, been immunized.

{¶13} Dr. Alarafi opined that T.J. "probably" would have survived if a medical professional had been involved in her care. He testified that T.J.'s condition "shocked" him, that he had been in medicine for over 20 years, and T.J.'s situation was the "worst

---

[3]The state presented Dr. Alarafi as a fact, not expert, witness. He, therefore, had not submitted an expert report, and that was the ground of the defense's objection.

case I've ever seen of anything like this." Dr. Alarafi contacted the police to investigate T.J.'s death.

{¶14} Officer Timothy Casto spoke with Randy at the hospital. Randy told him that he and Carissa had taken T.J. to a doctor a month earlier for a physical, but Randy was unable to tell the officer the doctor's name or office location.

**Autopsy**

{¶15} An autopsy was performed on T.J.'s body on February 19, 2013, the day following her death. Deputy medical examiner Dr. Andrea McCollum, who supervised the autopsy, testified at trial. The cause of death was "polymicrobial sepsis," "acute necrotizing bronchopneumonia," and "staphylococcus, left leg abscess" and the manner of death was designated as homicide.

{¶16} Dr. McCollum explained that T.J. had an abscess, or a swollen area filled with pus, in her left leg near her ankle. The abscess became infected with a bacterium called staphylococcus (a staph infection), the infection festered, traveled into her bloodstream, and caused her to develop severe pneumonia in her lungs.

{¶17} Dr. McCollum testified that the manner of death was designated as homicide based on the Joneses' inaction: "[T.J.] was a child. A 12-year-old cannot be expected to seek medical attention. * * * They depend on their caregivers to provide that attention for them."

{¶18} Dr. McCollum admitted that T.J. could have developed the infection without having had the foot ulcers, and that the infection could have developed within a matter of

hours or days. But she also testified that wounds on T.J.'s feet were to the point where T.J.'s tissue was actually dying, and that would have taken days to weeks to progress to that point.

{¶19} Further, Dr. McCollum testified about injuries T.J. had on her neck, head, torso, right arms and legs, and left leg, and that T.J. had bedsores. Dr. McCollum also testified that T.J. was in the 10th percentile on the body mass index and below the 5th percentile for stature for age and weight for her age.

{¶20} Neither defense counsel for Randy nor Carrisa questioned Dr. McCollum on cross-examination.

{¶21} Dr. Thomas Gilson, the chief medical examiner for Cuyahoga County, also testified as follows to elaborate on the homicide manner of death designation:

> We felt that this was an instance of medical negligence as the result of a caregiver not providing adequate care to this child. A reasonable person would have sought treatment for this child. This child had gangrene on her feet. She had an abscess. These are conditions that would have been painful. * * * They would have been foul-smelling.

{¶22} According to Dr. Gilson, T.J. also would have been "coughing, bringing up phlegm," and would have appeared "very sick." Dr. Gilson admitted that a person can develop sepsis, as T.J. had, and die suddenly from that. But it was his opinion that that did not occur in this case. Specifically, he testified that the evidence from the autopsy findings indicated that T.J. did not die from "necrotizing fasciitis," which occurs when bacteria "seed" then quickly proliferate in the fascia (tissue that surrounds the muscle), before causing sepsis. The doctor also testified that he did not observe any active

bedsores on T.J.'s body.

**{¶23}** Counsel for Randy did not cross-examine Dr. Gilson and Carissa's counsel cross-examined him only as to the autopsy procedure.

**Investigation into T.J.'s Death**

**{¶24}** One of the officers who responded to the Joneses' home as a result of the 911 call photographed the home. The photographs showed various over-the-counter medications and supplies in T.J.'s room. Also found in T.J.'s room was Carissa's antibiotic prescription, which had been filled at a CVS Pharmacy on February 10, 2013. Randy denied that either he or Carissa had given the antibiotic to T.J., and the laboratory results from the autopsy were inconclusive as to the issue.

**{¶25}** In March 2013, Paul Sturman, an investigator for the Cuyahoga County Department of Children and Family Services ("CCDCFS"), interviewed the Joneses at their home. Sturman testified that the Joneses were cooperative and still in shock and grieving. He viewed the schooling area for T.J. and found it to be adequate and appropriate. A day-by-day calendar in the schooling area showed the date of "January 7." Sturman testified about T.J.'s history, the days leading up to her death, and the day of her death, the sum and substance of which was generally the same as has already been stated.

**{¶26}** Sturman also questioned the Joneses about the other injuries on T.J.'s body. The Joneses told him that they attributed them to T.J.'s self-injurious behavior. Randy also told Sturman that it was like "pulling teeth" to get T.J. to tell them how she got her

injuries, and so they set up a camcorder to help them learn. Further, Randy also said that because of her high tolerance for pain, T.J. could get burned or blisters without calling out in pain. The Joneses also told Sturman that T.J. was a "hefty eater," but just did not gain weight.

{¶27} Detective Darren Porter was assigned to investigate the case. He was called to the scene after the 911 call and arrived when T.J. was in the ambulance. Detective Porter testified that he did not smell any odors in the home except for vomit. He saw food in T.J.'s bedroom. The detective also went to the hospital, and testified that when he entered the examination room where T.J.'s body was he immediately smelled something foul. He also testified that he saw Randy at the hospital and he was "highly emotional."

**The Defense's Case**

**Randy's Case**

{¶28} As mentioned, Randy testified at trial. In addition to himself, he presented seven other witnesses. One of the witnesses, Dr. Janice Ophoven, a pediatric forensic pathologist, testified as an expert witness.

{¶29} Dr. Ophoven testified that bacteria can cause a rapid and fatal infection in just a few hours, and that with an infection, no one can predict a time line. She opined that if the infection had been in T.J.'s body for an extended period of time, it would have traveled into T.J.'s deep tissue and bones, and there was no evidence of that. Dr. Ophoven found Randy's treatment of T.J.'s blisters appropriate and testified that his

home remedy would have likely reduced the amount of pain T.J. experienced. The doctor also did not find any evidence of abuse or malnutrition of T.J. She testified that anyone undergoing approximately 45 minutes of CPR, as T.J. had, would have a distended stomach.

{¶30} After her review of this case, which included the autopsy protocol, Dr. Ophoven agreed with the medical examiner's determination as to the cause of T.J.'s death, but disagreed with the homicide designation as the manner of death. According to Dr. Ophoven, T.J. died of natural causes as a result of the bacteria spreading through her body. Dr. Ophoven testified that she believed that the Joneses were unaware of how sick T.J. was, and that they were not neglectful by not taking her to a doctor because "you don't take your kid to the doctor to discover unknown diseases if they don't have signs and symptoms of diseases." But the doctor also admitted that there was a "component of delay in seeking medical attention," and that a "typical" family would have sought medical treatment. She attributed the other injuries on T.J.'s body as the result of T.J.'s self-picking.

{¶31} Dr. Ophoven also testified that there is debate within the forensic pathology community over the use of the term "homicide." She believed that defining homicide as "being death at the hands of another" is "oversimplified." The doctor gave the example of backing over a child in a driveway; she opined that that would be an accident, rather than a homicide.

{¶32} Randy's remaining witnesses were character witnesses, who collectively

testified that the Joneses had a loving and nurturing relationship with T.J., that they never noticed anything was amiss with the family, and that they were shocked by the charges brought against Randy and Carissa.

**Carissa's Case**

{¶33} Carissa did not testify, but presented one witness, her cousin. The cousin testified that Randy was the "emotional" one in the relationship, while Carissa was the "stern" one.

**State's Rebuttal Witness**

{¶34} The state presented one rebuttal witness, a parishioner from the Joneses' church. According to the parishioner, the Jones family "secluded" themselves and T.J. appeared to be afraid of Carissa. The parishioner testified that she once noticed that T.J.'s ankles appeared to be swollen, but she could not qualify when that was. She admitted, however, that T.J. never appeared to have any mobility issues and she never felt the need to contact CCDCFS.

**Verdict and Sentence**

{¶35} On the above evidence, the jury found Randy and Carissa each guilty of involuntary manslaughter, permitting child abuse, and two counts of endangering children. The jury found them both not guilty of one count of endangering children.[4] The parties agreed that the counts all merged, and the state elected to proceed to sentencing under the involuntary manslaughter count. Neither Randy nor Carissa had a

---

[4]That count alleged that the defendants "recklessly tortured or cruelly abused" T.J.

criminal history. The court sentenced each to a ten-year term. This appeal ensued.

## II. Assignments of Error

### Randy's Assignments of Error

I. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 for involuntary manslaughter because the charge is not supported by sufficient evidence.

II. Appellant's convictions were against the manifest weight of the evidence.

III. The trial court committed reversible error when permitting opinion testimony for a witness that was not qualified as an expert.

IV. The trial court erred by denying defense requests for jury instructions and for providing improper and incomplete instructions over objection.

V. The ten-year prison sentence rendered by the trial court judge is contrary to law and not supported by the record.

### Carissa's Assignments of Error

I. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

II. Appellant's convictions are against the manifest weight of the evidence.

III. Appellant was deprived of due process and a fair trial when the state introduced irrelevant, prejudicial, other acts evidence and hearsay in violation of Evid.R. 401, 402, 403, 404, 602, 701 and 702, and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

IV. The trial court erred by denying defense requests for jury instructions and for providing improper and incomplete instructions over objection.

V. The ten-year prison term is contrary to law and is not supported by the record.

### III. Law and Analysis

**Sufficiency of the Evidence**

{¶36} At the conclusion of the state's case and the conclusion of the defense's case, both Randy and Carissa made Crim.R. 29 motions for judgments of acquittal, which the trial court denied. In their first assignments of error, Randy and Carissa contend that the trial court erred in denying their Crim.R. 29 motions. Both contend that the evidence was insufficient to demonstrate that they acted recklessly, the mens rea for the crimes, and that the evidence was insufficient to demonstrate that their actions/inactions were the proximate cause of T.J.'s death.

{¶37} When reviewing the sufficiency of the evidence, our inquiry focuses primarily upon the adequacy of the evidence; that is, whether the evidence, if believed, reasonably could support a finding of guilt beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997); *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "'Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Thompkins* at *id.*

{¶38} The standard of review is whether, after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a

reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Jenks* at *id.*

{¶39} "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." R.C. 2901.22(C).

{¶40} This court has held, under the substantively same definition of reckless, that a parent may be found to be reckless for failing to seek medical treatment for an injured or ill child. *State v. Reynolds*, 8th Dist. Cuyahoga No. 65342, 1994 Ohio App. LEXIS 3610, 26 (Aug. 18, 1994); *see also State v. Scott*, 3d Dist. Hardin No. 6-07-17, 2008-Ohio-86; *State v. Stewart*, 5th Dist. Stark No. 2007-CA-00059, 2007-Ohio-6118; *State v. Stewart*, 5th Dist. Stark No. 2007-CA-00068, 2007-Ohio-6177; *State v. Traster*, 9th Dist. Summit No. 17548, 1996 Ohio App. LEXIS 4619 (Oct. 23, 1996); *State v. Sandefur*, 9th Dist. Summit No. 15787, 1993 Ohio App. LEXIS 3983 (Aug. 11, 1993).

{¶41} Upon review, we find that the state presented sufficient evidence as to the Joneses' recklessness. The record demonstrates that since 2009 they did not have T.J. under any medical care, including during the time of her illness immediately preceding her death. In finding the evidence sufficient to support the convictions, we note that it was not necessary for the state to prove that Randy and Carissa knew specifically what

medical condition T.J. had or that it would lead to her death. Rather, under R.C. 2919.22, the endangering children statute, the state was only required to prove that the Joneses, through their inaction, created a "substantial risk to the health or safety" of T.J.

**{¶42}** Dr. McCollum testified that the gangrenous wounds on T.J.'s feet had developed for days or weeks and were to the point where the tissue was dying. Dr. Alarafi also testified that the wounds had to have been present for a period of time to have deteriorated to the point they had. The three doctors who testified for the state — Drs. McCollum and Alarafi, along with Dr. Gilson — all believed that a reasonable person would have sought medical treatment for the wounds on T.J.'s feet. Drs. McCollum and Gilson's testimony as to the substantive findings of the autopsy were not challenged by the defense. And, even the defense's witness, Dr. Ophoven, admitted that there was a "component of delay in seeking medical attention."

**{¶43}** Further, at the hospital Randy told the police that he and Carissa had taken T.J. to the doctor one month prior to her death, but admitted during his testimony that T.J. had not been to a doctor in the approximately four years before her death. A reasonable inference could be made from that testimony that the Joneses believed that they should have sought medical treatment for their daughter.

**{¶44}** Another reasonable inference could have been made, based on the evidence that T.J. had bedsores, food was found her in her room, and the day-by-day calendar in the schooling area had the date "January 7," that T.J. had become so ill that she was bedridden.

**{¶45}** In light of the above, the state presented sufficient evidence of recklessness.

**{¶46}** We likewise find that the state presented sufficient evidence that the Jones's inaction was the proximate cause of T.J.'s death.

**{¶47}** Criminal conduct constitutes the "proximate cause" of a death, when the conduct "(1) caused the result, in that but for the conduct, the result would not have occurred, and (2) the result [was] foreseeable." *State v. Gibson*, 8th Dist. Cuyahoga No. 98725, 2013-Ohio-4372, ¶ 36, citing *State v. Muntaser*, 8th Dist. Cuyahoga No. 81915, 2003-Ohio-5809, ¶ 38. "Foreseeability is determined from the perspective of what the defendant knew or should have known, when viewed in light of ordinary experience." *Muntaser* at *id.* Results are foreseeable when the consequences of an action are "natural and logical," meaning "that [they are] within the scope of the risk created by the defendant." *Id.*, citing *State v. Losey*, 23 Ohio App.3d 93, 491 N.E.2d 379 (10th Dist.1985).

**{¶48}** The Joneses cite Dr. McCollum's admission that a staph infection can happen even without the type of injuries that T.J. had to her feet as ground that the state failed to prove proximate cause. Although Dr. McCollum did testify that an infection "can happen independently as well," the state presented sufficient evidence that that was not the case here, and that was not Dr. McCollum's opinion. The state presented testimony that the staph infection developed in T.J.'s left ankle and caused bacteria to enter her bloodstream, which traveled to her lungs, caused severe pneumonia, and killed her. Thus, the state presented evidence that, if believed, proved that without the abscess

in T.J.'s ankle, there would have been no staph infection and no pneumonia.

{¶49} As to foreseability, the state also presented sufficient evidence that, if believed, would prove that the consequences of the Jones's inaction were "natural and logical." As mentioned, although a person can have a staph infection without visible injuries, the state presented evidence that that was not the case with T.J. Specifically, the state presented evidence about the foul odor that was coming from T.J.'s feet, as well as the appearance of her feet and legs. Thus, the evidence was sufficient to prove that, based on T.J.'s visible injuries, the Joneses knew or should have known that T.J. required medical attention.

{¶50} In light of the above, the evidence was sufficient to support the convictions and the Joneses' first assignments of error are overruled.

**Manifest Weight of the Evidence**

{¶51} For their second assignments of error, the Joneses contend that the convictions are against the weight of the evidence. We disagree.

{¶52} Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 387-388, 2007-Ohio-2202, 865 N.E.2d 1264. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? Even though there may be sufficient evidence to support a conviction, a reviewing court can still re-weigh the evidence and reverse a lower court's holdings." *Id.* at 387. However, an appellate court may not merely substitute its view for that of the jury, but must find that "the jury clearly lost its way and created such a manifest

miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d 380 at 387, 678 N.E.2d 541. Accordingly, reversal on manifest weight grounds is reserved for the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶53} Upon review, we will not usurp the jury's findings in this case. For the reasons already discussed in analyzing the first assignments of error, the jury did not clearly lose its way. In sum, the state's plausible theory of the case was that the Joneses knew or should have known that T.J. was in need of medical treatment, but failed to provide the care for their daughter, and presented evidence to that effect. The defense's plausible position was that Randy and Carissa did not know how sick T.J. was and they treated her themselves, as they had done in the past. The jury believed the state's theory. There is nothing incredible about the jury's determination. Thus, we defer to the jury, who, as factfinder, was best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, eye movements, and gestures of the witnesses testifying before it. *See Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

{¶54} For the reasons stated above, the second assignments of error are overruled.

**Evidentiary Rulings**

{¶55} In their third assignments of error, Randy and Carissa challenge various testimony and evidence allowed by the trial court. We review a trial court's decision

regarding the admission of evidence for an abuse of discretion. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). Thus, our inquiry is limited to determining whether the trial court acted unreasonably, arbitrarily or unconscionably in deciding the evidentiary issues. *State v. Barnes*, 94 Ohio St.3d 21, 23, 2002-Ohio-68, 759 N.E.2d 1240.

**Dr. Alarafi's Opinion Testimony**

{¶56} Randy and Carissa both challenge the admission of Dr. Alarafi's opinion testimony on various aspects of T.J.'s condition, contending that it was improper because he did not file an expert report and, therefore, was not an expert witness. Specifically, Dr. Alarafi opined about how long it would have taken for T.J.'s wounds to progress to the point they had and about her general care. He also opined that T.J. was malnourished.

{¶57} Evid.R. 701 governs opinion testimony by lay witnesses and provides as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

{¶58} The Ohio Supreme Court has addressed the issue of lay witnesses testifying

on issues generally reserved for expert testimony, stating the following:

> It is consistent with [the] emerging view of Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. * * * Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R. 702, but rather are based upon a layperson's personal knowledge and experience.

*State v. McKee*, 91 Ohio St.3d 292, 296-297, 2001-Ohio-41, 744 N.E.2d 737; *see also State v. Wilkinson*, 8th Dist. Cuyahoga No. 100859, 2014-Ohio-5791, ¶ 52-53; *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 74; *State v. Cooper*, 8th Dist. Cuyahoga No. 86437, 2006-Ohio-817, ¶ 18.

{¶59} Further, under Loc.R. 21.1(C), trial courts have the discretion to determine whether a treating physician's hospital or office records satisfy the requirements of a written report. This court recently addressed this issue, and found that a treating physician's testimony regarding his or her perceptions and observations about a patient is "'consistent with [the] emerging view under Evid.R. 701 that courts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702.'" *State v. Heineman*, 8th Dist. Cuyahoga No. 103184, 2016-Ohio-3058, ¶ 25, quoting *McKee* at *id.*

{¶60} Upon review, we find that admission of Dr. Alarafi's opinion testimony was not an abuse of discretion. Dr. Alarafi testified that he had been an emergency room physician for approximately 20 years, and that this was the "worst case" of anything of

this nature that he had seen. He was alarmed by what he saw and, therefore, reported it to the police. His testimony about what he found alarming was helpful to explain to the jury why he would report the case to the police. The testimony was further helpful to aid the jury in understanding T.J.'s condition and how sick she was. "It is well established that treating physicians can be called at trial to testify as viewers of their patients' physical condition * * *." *State v. Brofford*, 3d Dist. Union No. 14-12-08, 2013-Ohio-3781, ¶ 35, citing *Williams v. Reynolds Rd. Surgical Ctr.*, 6th Dist. Lucas No. L-02-1144, 2004-Ohio-1645, ¶ 6. Any contradiction to Dr. Alarafi's testimony that was drawn through the testimony of the other expert witnesses went to the weight, not admissibility, of Dr. Alarafi's testimony.

**{¶61}** In light of the above, the trial court did not abuse its discretion in allowing Dr. Alarafi's opinion testimony. Randy's third assignment of error, which solely raises the issue of Dr. Alarafi's testimony, is overruled, and the portion of Carissa's third assignment of error relative to this issue is overruled.

**Medical Examiner's Manner of Death Testimony**

**{¶62}** Carissa also challenges in her third assignment of error Drs. McCollum's and Gilson's testimony that T.J.'s manner of death was homicide. Carissa contends that the testimony was improper because it addressed the "ultimate issue" in the case and "inevitably led to jury confusion and impacted the verdicts in this case." We disagree.

**{¶63}** The Ohio Rules of Evidence provide that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces

an ultimate issue to be decided by the trier of fact." Evid.R. 704.

**{¶64}** R.C. 313.19, governing the coroner's determination as to the legally accepted manner of death, recognizes the quasi-judicial character of the coroner's duties. The statute provides:

> The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict * * * shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred, after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death.

**{¶65}** In *Vargo v. Travelers Ins. Co.*, 34 Ohio St.3d 25, 516 N.E.2d 226 (1987), the Supreme Court of Ohio held that the "coroner's factual determinations concerning the manner, mode and cause of the decedent's death, as expressed in the coroner's report and death certificate, create a nonbinding rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary." *Id.* at paragraph one of the syllabus. Thus, it is recognized that "it is clearly within the expertise of the coroner to give an opinion on whether a death is a homicide." *State v. Simpson*, 11th Dist. Lake No. 93-L-014, 1994 Ohio App. LEXIS 4472, * 21 (Sept. 30, 1994), citing *State v. Harrison*, 1st Dist. Hamilton No. C-920422, 1993 Ohio App. LEXIS 2446 (May 12, 1993).

**{¶66}** In light of the above, Drs. McCollum and Gilson's testimony was proper. Moreover, the trial court gave the jury a limiting instruction as to their testimony, instructing the jury that their use of the term "homicide" was different than the legal term used in the jury instructions.

**{¶67}** Carissa's third assignment of error, as it relates to Drs. McCollum and Gilson's testimony is, therefore, overruled.

**Testimony about other Injuries T.J. had**

**{¶68}** Carissa's third assignment of error further challenges testimony about, and photographs depicting, other injuries (i.e., injuries other than on her feet and leg) T.J. had. Carissa did not object to this testimony and we therefore review for plain error. *See* Crim.R. 52(B).

**{¶69}** Count 3 of the indictment charged endangering children by "recklessly abusing" T.J. Thus, the testimony and evidence that Carissa now challenges was relevant to that count. After review, we find that the state did not belabor the point about the other injuries, and that the testimony and photographs about them were properly admitted. Therefore, Carissa's third assignment of error, as it relates to testimony and evidence about T.J.'s other injuries, is overruled.

**Carissa's Medical Care in the Days Leading up to T.J.'s Death**

**{¶70}** Prior to trial, Carissa filed a motion in limine, seeking to bar the state from putting forth evidence that Carissa sought medical treatment for herself in February 2013, when both she and T.J. had colds. The trial court denied Carissa's request to limit the evidence and further denied her request to provide a limiting instruction regarding the evidence. Carissa claims that allowing the evidence was unduly prejudicial.

**{¶71}** Evid.R. 402 provides that relevant evidence is generally admissible, but irrelevant evidence is inadmissible. Under Evid.R. 403, relevant evidence may excluded

on the grounds of prejudice, confusion, or undue delay, and provides as follows:

(A) Exclusion mandatory.  Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

(B) Exclusion discretionary.  Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

{¶72} In reaching a decision involving admissibility under Evid.R. 403(A), a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect.  *State v. Steele*, 10th Dist. Franklin No. 95APA01-124, 1995 Ohio App. LEXIS 4086 (Sept. 21, 1995).  In order for the evidence to be deemed inadmissible, its probative value must be minimal and its prejudicial effect great.  *State v. Morales*, 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987).  But although generally "all evidence presented by a prosecutor is prejudicial, * * * not all evidence *unfairly* prejudices a defendant."  (Emphasis added.)  *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 107.

{¶73} Furthermore, relevant evidence that is challenged as having probative value that is substantially outweighed by its prejudicial effects should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to the party opposing its admission.  *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984).

{¶74} Evidence that Carissa treated with a doctor was relevant in this case.  It showed that Randy and Carissa knew that when a person is sick, medical care is

necessary.   It also explained the antibiotic prescribed to Carissa that was found in T.J.'s room.   Further, viewing the evidence most favorably to the state as we are required to do, we find that the probative value of the evidence was not outweighed by its prejudicial effect.

{¶75} In light of the above, Carissa's final contention in her third assignment of error is without merit, and her assignment is overruled in toto.

**Jury Instructions**

{¶76} In their fourth assignments of error, Randy and Carissa contend that the trial court erred in its instructions to the jury.   Specifically, they both contend that the trial court erred in denying their request for an expanded definition of "recklessness."   They also both contend that the trial court erred in failing to give the "multiple defendants" instruction.

{¶77} Carissa also challenges the trial court's (1) denial of her request for a limiting instruction regarding the medical treatment she obtained for herself in the days leading up to T.J.'s death; and (2) instruction that the medical definition of homicide differed from the legal definition.

{¶78} In general, the giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.   *State v. Taylor*, 5th Dist. Holmes No. 12CA18, 2013-Ohio-5751, ¶ 34, citing *State v. Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462 (3d Dist.1993). Thus, in reviewing a trial court's jury instruction, an appellate court "determines whether the trial court abused its discretion in

refusing to give a requested instruction under the facts and circumstances of the case."

*State v. Brunner*, 10th Dist. Franklin No. 15AP-97, 2015-Ohio-4281, ¶ 31. Further, we review jury instructions "as a whole." *Taylor* at *id.*

**Recklessness Instruction**

{¶79} Randy and Carissa sought to have the trial court instruct the jury on an expanded definition of recklessness out of concern that the jury would apply the ordinary meaning of reckless, rather than its legal definition. In support of their request, they cited *State v. Peck*, 172 Ohio App.3d 25, 2007-Ohio-2730, 872 N.E.2d 1263 (10th Dist.), in which the Tenth Appellate District expounded on the definition of recklessness in determining the sufficiency of the evidence. The court declined the Joneses' request, and instead instructed the jury on recklessness as set forth in the Ohio Jury Instructions (OJI). We find no abuse of discretion in its instruction.

{¶80} A trial court "must act with extreme caution when giving an instruction that is outside the standard Ohio Jury Instructions to ensure that it is a correct statement of the applicable law. This is especially true when the trial court elects to use language from an appellate court opinion, which was not intended to be used as a jury instruction." *State v. Jeffers*, 11th Dist. Lake No. 2007-L-011, 2001-Ohio-1894, ¶ 49.

{¶81} The OJI instruction the trial court provided read as follows: "A person acts recklessly when, with heedless indifference to the consequences, he or she perversely disregards a known risk that his or her conduct is likely to cause a certain result or is likely to be of a certain nature." Ohio Jury Instructions Section 417.17. The court also

gave the OJI instruction of "substantial risk," which defines it as a "strong possibility as contrasted with a remote or even a significant possibility that a certain result may occur or that certain circumstances may exist." *Id.*

{¶82} Upon review, the trial court did not abuse its discretion by denying the Joneses' request for an expanded instruction on recklessness. The expanded instruction that the Joneses sought would have been cumulative to the OJI.[5] Further, the instruction that the court gave mirrored the statutory definition.

{¶83} Additionally, the Joneses' contention that the trial court misstated the definition of recklessness by referring to the dictionary is without merit. The statement made by the court was as follows:

> Now, I've outlined the essential elements of the offenses charged in this indictment. I could not include all of the law in any single part of these instructions. This is important. You must consider each part in light and in harmony with the entirety of the instruction. It's not to picked apart word by word, ladies and gentlemen. There's no magic here, okay? Each of the definitions flow, the instructions flow, in light and harmony with each other, all right? And I've said this before to juries. There's no magic to the language. It's common English, Webster's dictionary language here, okay?

{¶84} This statement by the court was made after it had instructed the jury on recklessness as set forth in OJI. No other definition of recklessness was provided to the jury. Therefore, viewing the instructions as a whole as we are required to do, we find no abuse of discretion in the court's statement. Thus, the Jones's fourth assignments of

---

[5]The expanded definition included language that the "mere failure to perceive or avoid a risk, because of lack of due care, does not constitute reckless conduct" because a defendant "must recognize the risk of the conduct." *Peck* at ¶ 12.

error are overruled as it pertains to the "recklessly" instruction given by the court.

**Limiting Instruction regarding Carissa's Medical Treatment**

{¶85} We next consider Carissa's contention that the trial court should have provided the jury with a limiting instruction regarding evidence of the medical treatment she obtained for herself. Carissa contends that the evidence was "other acts" evidence and, therefore, the jury should have received an other acts evidence limiting instruction under Evid.R. 404(B). We disagree.

{¶86} Evid.R. 404(B), governing other crimes, wrongs or acts, provides in pertinent that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶87} Evid.R. 404(B) only applies to limit the admission of so-called "other acts" evidence that is "extrinsic" to the crime charged. *State v. Stallworth*, 11th Dist. Lake No. 2013-L-122, 2014-Ohio-4297, ¶ 37. In other words, "Evid.R. 404(B) does not apply when the acts are intrinsic as opposed to extrinsic, i.e., the acts are part of the events in question or form part of the immediate background of the alleged act which forms the basis for the crime charged." *State v. Crew*, 2d Dist. Clark No. 2009 CA 45, 2010-Ohio-3110, ¶ 99. Thus, "evidence of other crimes or wrongs may be admitted when such acts are so inextricably intertwined with the crime as charged that proof of one involves the other, explains the circumstances thereof, or tends logically to prove any

element of the crime charged." *State v. Davis*, 64 Ohio App.3d 334, 341, 581 N.E.2d 604 (12th Dist.1989), citing *State v. Wilkinson*, 64 Ohio St.2d 308, 415 N.E.2d 261 (1980); *State v. Long*, 64 Ohio App.3d 615, 582 N.E.2d 626 (9th Dist.1989).

{¶88} The endangering children counts alleged that the Joneses "recklessly create[d] a substantial risk to the health or safety of" T.J.; "recklessly abuse[d]" T.J.; and "recklessly torture[d] or cruelly abuse[d]" T.J. The state did not attempt to get Carissa's medical treatment in as an exception to the general ban on other acts under Evid.R. 404(B), that is, to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rather, the state sought to admit the evidence "with regard to the recklessness element and the duty of care * * *."

{¶89} In light of the above, the court did not abuse its discretion in not giving an "other acts" limiting instruction as to the evidence of Carissa's medical treatment. The state did not introduce the evidence as a permissible exception to the general ban on other acts evidence under Evid.R. 404(B). Rather, it was introduced as "part and parcel" of the state's theory of recklessness; that is, as the assistant prosecuting attorney contended, for the jury to "[l]ook at [the evidence] in the lens of the duty of care that parents owe to their children," and to consider it in light of the fact that Carissa sought medical treatment for herself days before T.J.'s death, but did not do the same for T.J.

**Definition of Homicide: Legal Definition v. Medical Definition**

{¶90} As mentioned, during his testimony Dr. Gilson stated that the homicide designation as to the manner of T.J.'s death was based on the Jones's "negligence for not

seeking medical care." Carissa contends that that testimony confused the jury and the court did not properly instruct the jury on the issue. But, *as agreed to by all the parties*, the court instructed the jury as follows:

> You have heard testimony from experts in the field of forensic pathology. These witnesses have testified as to the meaning of the term homicide within the field of forensic pathology. This testimony is not to be considered for any other purpose than the use of the term homicide within that field and should not be confused with the instructions of law regarding any legal term as used in these instructions.

{¶91} "A jury is presumed to follow the instructions, including curative instructions, given it by a trial judge." *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). There was no abuse of discretion in the instruction given by the trial court; the instruction cured any potential confusion there may have been.

**Lack of Multiple Defendants Instruction**

{¶92} The last challenge relative to the jury instructions relates to the lack of a "multiple defendants" instruction. The Joneses never requested the instruction and, therefore, have waived all but plain error. *State v. Hartman*, 93 Ohio St.3d 274, 289, 754 N.E.2d 1150 (2001). Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240.

{¶93} In a case involving two or more defendants, the court must take care that evidence against one defendant is not misinterpreted by the jury and used as "spill-over"

evidence or "guilt transference" that serves as the basis for convicting another defendant not connected to the evidence. *United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir.1985). The existence of a "spill-over" or "guilt transference" effect turns in part on whether the numbers of theories and defendants involved were too great for the jury to give each defendant the separate and individual consideration of the evidence against him or her to which he or she was entitled. *Id.* The primary concern is whether the jury will be able to segregate the evidence applicable to each defendant and follow the instructions of the court as they apply to each defendant. *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); *United States v. Causey*, 834 F.2d 1277 (6th Cir.1987).

{¶94} The Joneses do not set forth any particulars that would demonstrate that the lack of a "multiple defendants" instruction affected their substantial rights. The evidence against Carissa and Randy was, for all intents and purposes, the same. Their positions were not antagonistic to each other, but, rather, they pursued a joint defense.

{¶95} Moreover, at both the start and end of trial, the court informed the jury that Randy and Carissa were separate defendants. At the start, the court told the jury, "[w]hen considering the evidence in this case, at the end of this trial you will deliberate separately for each defendant, all right? So keep that in mind. The evidence that the State has regarding Randy Jones may be different in some sort than the evidence the State has against Carissa Jones, and vice versa, okay?"

{¶96} At the conclusion of trial, the court told the jury that Randy and Carissa are

"separately charged. So this one says *State of Ohio v. Carissa Jones*. This one says *State of Ohio v. Randy Jones*. That's what I mean by the defendants are separate and the verdicts are separate for each of them, okay?"

{¶97} In light of the above, there was no plain error in the lack of a "multiple defendants" jury instruction.

{¶98} In light of the above, the Joneses' fourth assignments of error are overruled.

**Sentences**

{¶99} In their final assignments of error, Randy and Carissa challenge their ten-year prison sentences. In our original opinion, we found that the sentences were not contrary to law, but that we needed a "more developed record to determine whether, by clear and convincing evidence, the record does not support the sentences as the Joneses contend." *Jones*, 2016-Ohio-5923, ¶ 105, 112. Specifically, we ordered the trial court to further develop the record as it related to the findings under R.C. 2929.11 and 2929.12. *Id.* at ¶ 106. Randy Jones filed a motion with this court to reconsider this issue, contending that the sentences were contrary to law. The state filed a motion to en banc the sentencing issue. We have reconsidered the issue, as set forth below, and deny the state's motion to en banc.

{¶100} Our review of felony sentences is governed by R.C. 2953.08. Relevant to this case, Subsection (A) of the statute provides as follows:

(A) In addition to any other right to appeal and except as provided in

division (D)[6] of this section, a defendant who is convicted of or pleads guilty to a felony may appeal as a matter of right the sentence imposed upon the defendant on one of the following grounds:

* * *

(4)　The sentence is contrary to law.

**{¶101}** Further relevant to this appeal is subsection (G)(2) of R.C. 2953.08, which provides as follows:

(2)　The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a)　That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code,

---

[6]Subsection (D) relates to (1) jointly recommended sentences, (2) offenders who have been convicted of three or more certain offenses within the preceding 20 years, and (3) certain aggravated murder, murder, and terrorism offenses.

whichever, if any, is relevant;

(b)    That the sentence is otherwise contrary to law.

**{¶102}** Thus, while R.C. 2953.08(G)(2)(a) specifically mentions R.C. 2929.13, 2929.14(B)(2)(e) and (C)(4), and R.C. 2929.20(I), it omits any mention of R.C. 2929.11 and 2929.12.    Recently, the Ohio Supreme Court addressed R.C. 2953.08(G)(2)'s omission of the factors under R.C. 2929.11 and 2929.12 as follows:

We note that some sentences do not require the findings that R.C. 2953.08(G) specifically addresses.    Nevertheless, it is fully consistent for appellate courts to review those sentences that are imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12 under a standard that is equally deferential to the sentencing court.    That is, an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence.

*State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 23.    Thus, *Marcum* read R.C. 2929.11 and 2929.12 into R.C. 2953.08(G)(2)(a), allowing an appellate court to increase, reduce, or otherwise modify a sentence or vacate the sentence and remand the matter to the sentencing court for resentencing if the record does not support the sentencing court's findings under R.C. 2929.13 (B) or (D), R.C. 2929.14(B)(2)(e) or (C), R.C. 2929.20(I), as well as under R.C. 2929.11 and 2929.12.

**{¶103}** We now consider the issue of how *Marcum* reconciles with this court's

past treatment of "contrary to law," which is the ground on which the state's motion for en banc review is based.   As we noted in our original opinion, this court has consistently held that a sentence is not contrary to law if a trial court states that it "considered" the required sentencing factors under R.C. 2929.11 and 2929.12 and the sentence falls within the appropriate statutory range.   *See Jones*, 2016-Ohio-5923 at ¶ 105.

{¶104} *Marcum,* as noted above, appears to conflict with this court's traditional definition of contrary to law in that it allows an appellate court to vacate or modify a sentence, despite the sentence not being contrary to law (i.e., within the statutory range and imposed after consideration of R.C. 2929.11 and 12), where an appellate court finds by clear and convincing evidence that the record does not support the sentence under R.C. 2929.11 and 2929.12.   But, upon close examination of R.C. 2953.08(G)(2), the perceived conflict is illusory.   Specifically, R.C. 2953.08(G)(2)(b) provides that an "appellate court may take any action authorized by this division if it clearly and convincingly finds * * * [t]hat the sentence is *otherwise* contrary to law."   (Emphasis added.)   That the statute uses the word "otherwise" is key.

{¶105} If a sentence violated R.C. 2953.08(G)(2)(a) because the record did not support the findings under one of the enumerated sentences, the sentence would be contrary to law, regardless of whether the trial court stated that it considered the required sentencing law and imposed a sentence within the applicable range.   That is how this court has treated the findings necessary for imposing consecutive sentences, for example.   Under *Marcum,* the same is true because, as mentioned, the Ohio Supreme Court read

R.C. 2929.11 and 2929.12 into R.C. 2953.08(G)(2)(a). A violation of subsection (a) therefore renders a sentence contrary to law regardless of whether it is "otherwise" contrary to law under subsection (b).

{¶106} Upon review, we believe that this court's traditional definition of "contrary to law" has actually been the definition of "otherwise contrary to law" under the catchall provision of R.C. 2953.08(G)(2)(b). But, as discussed, there are other ways a sentence may be contrary to law, that is, a violation of R.C. 2953.08(G)(2)(a).

{¶107} This opinion does not conflict with this court's prior decisions. For example, in *State v. Ongert*, 8th Dist. Cuyahoga No. 103208, 2016-Ohio-1543, one of the first cases decided by this court after *Marcum*, this court found that felony sentencing cases could not be reviewed unless they fell within one of the five categories listed under R.C. 2953.08(A), the most common of which are maximum sentences (subsection (1)) and sentences that are "contrary to law" (subsection (4)). This court found the defendant's sentence unreviewable because it considered the statutory factors and was within the statutory range. *Ongert* at ¶ 15.

{¶108} Although the *Ongert* decision was well reasoned, it did not reconcile its analysis with the specific language in *Marcum* in which the Ohio Supreme Court read R.C. 2929.11 and 2929.12 into R.C. 2953.08(A). *Marcum* at ¶ 23. It is significant that the court addressed R.C. 2953.08's omission of R.C. 2929.11 and 2929.12, and this opinion issued on reconsideration addresses that particular language, which prior cases have failed to do. Thus, in accordance with *Marcum*, if an appellate court finds by clear

and convincing evidence that the record does not support the sentence under R.C. 2929.11 and 2929.12, the sentence is contrary to law and we have the authority to review it under R.C. 2953.08(A)(4). *Marcum* at ¶ 23.

{¶109} "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). Upon review, we find by clear and convincing evidence that the sentences here are contrary to law.

{¶110} R.C. 2929.11(A) governs the purposes and principles of felony sentencing and provides that a sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing, which are (1) to protect the public from future crime by the offender and others, and (2) to punish the offender using the minimum sanctions that the court determines will accomplish those purposes. Further, the sentence imposed shall be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact on the victim, and consistent with sentences imposed for similar crimes by similar offenders." R.C. 2929.11(B).

{¶111} R.C. 2929.12 sets forth the seriousness and recidivism factors for the sentencing court to consider in determining the most effective way to comply with the purposes and principles of sentencing set forth in R.C. 2929.11. The statute provides a

non-exhaustive list of factors a trial court must consider when determining the seriousness of the offense and the likelihood that the offender will commit future offenses.

{¶112} Prior to sentencing, the trial court received numerous letters in support of the Joneses, as well as a petition requesting that the Joneses be sentenced to community control sanctions. At the sentencing hearing, the trial court engaged in extensive colloquy with Randy, who continued to maintain that he and Carissa were unaware of how sick T.J. was and that they believed she was getting better with their treatment. Carissa's uncle spoke on the Joneses' behalf.

{¶113} A tragedy occurred in this case: T.J. died. On this record, however, we find that imprisoning her parents for ten years does not advance the two primary purposes of felony sentencing, that is, to protect the public from the Joneses and to punish them using minimum sanctions. We therefore vacate the sentences and remand for a resentencing hearing.

{¶114} In finding the sentences contrary to law we have considered the factors under R.C. 2929.12. Under the "more serious" factors in R.C. 2929.12(B), three of the nine apply.[7] Under the "less serious" factors in R.C. 2929.12(C), subsection (4) applies — "There are substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense."

---

[7] *See* R.C. 2929.12(B)(1) ("The physical or mental injury suffered by the victim of the offense due to the conduct of the offender was exacerbated because of the physical or mental condition or age of the victim"); (2) ("The victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense"); and (6) ("The offender's relationship with the victim facilitated the offense.")

Specifically, both Randy and Carissa had been law-abiding citizens.[8]  They cooperated with law enforcement from the beginning of its investigation, maintained their innocence and did not seek any leniency from the state (in terms of a plea deal).

{¶115} Further, the Ohio Supreme Court has held that remorse can be a mitigating factor.[9]  Both Randy and Carrisa expressed remorse for their actions.  Further, they presented mitigating evidence that they were of good character, were respected members of the community, and were loving and nurturing parents to T.J.

{¶116} In considering the "likely to commit future crimes" factors under R.C. 2929.12(D)[10]  we find that none apply, and that all five of the five factors set forth in R.C. 2929.12(E) indicating that the offender is "not likely to commit future crimes" apply.[11]

{¶117} In light of the above, pursuant to the authority afforded us under R.C. 2953.08(G)(2) and as provided in *Marcum*, we vacate the Joneses' sentences and remand this case to the trial court for resentencing.   The fifth assignments of error are sustained.

{¶118} Judgments affirmed in part and reversed in part.  The convictions are affirmed; the sentences are vacated and the case is remanded to the trial court for

---

[8] *See State v. Fox*, 69 Ohio St.3d 183, 194, 631 N.E.2d 124 (1994) (lack of a prior criminal record can be a mitigating factor).

[9] *See State v. Mitts*, 81 Ohio St.3d 223, 236-237, 690 N.E.2d 522 (1998).

[10] Those factors relate to prior criminal or juvenile history, rehabilitation, drug or alcohol abuse, and lack of genuine remorse.

[11] Those factors relate to lack of prior criminal history and whether the offense was committed under circumstances not likely to recur.

resentencing.

It is ordered that appellants and appellee split the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

LARRY A. JONES, SR., ADMINISTRATIVE JUDGE

MARY EILEEN KILBANE, J., and
MARY J. BOYLE, J., CONCUR