[Cite as *State v. Bey*, 2019-Ohio-1884.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106745**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JAMAL M. BEY

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-606375-A

**BEFORE:** Keough, J., Kilbane, A.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 16, 2019

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
2077 East Fourth Street, Second Floor
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
By:   Anna M. Faraglia
         Gregory Paul
Assistant County Prosecutors
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, J.:

**{¶1}** Defendant-appellant, Jamal Bey ("Bey"), appeals his conviction for murder. For the reasons that follow, we affirm his conviction, but remand the matter for the trial court to issue a corrected journal entry of conviction, nunc pro tunc, depicting a not guilty verdict on renumbered Count 1.

**{¶2}** In July 2016, Bey was named in a nine-count indictment charging him with one count each of aggravated murder, murder, felony-murder, felonious assault, failing to provide for a functionally impaired person, domestic violence, assault, and two counts of involuntary manslaughter. The charges stemmed from the death of his girlfriend, Lynita McCaslin ("Lynita").

**{¶3}** Prior to the start of trial, the state moved to dismiss Count 1, aggravated murder. At the request of the state, the trial court renumbered the remaining counts, and those eight counts were presented to the jury with the following testimony and evidence.

**{¶4}** On February 23, 2016, at 3:16 p.m., a 911 call was answered by Cleveland police from an unknown male caller stating that "someone living at 4509 West 221st Street has been very ill" and he has "not been able to get a hold of her." The caller stated "someone needs to go out and check on her." The caller hung up when dispatch told him he needed to call Fairview Park police. The call was played for the jury.

**{¶5}** Approximately 13 minutes later at 3:29 p.m. on that same day, a 911 call was answered by Fairview Park police from an unknown male caller stating that "a resident at 4509 West 221st Street has been very ill" and she was "not answering her phone." The

caller, who identified the resident as "Lynita McCaslin," requested that "someone check on her." When asked how he was related to Lynita, the caller responded "a friend." He reiterated that he believed "she needed help" because "it was not like her to not answer the phone." When police asked for his name, he responded "James," but when he was asked for his last name, "James" hung up. The call was played for the jury.

{¶6} Fairview Park Patrol Officer, Joseph Calabrese testified that on February 23 between 4:00 and 5:00 p.m., he conducted a general welfare check at 4509 West 221st Street. He stated that he knocked on the door and no one answered. Officer Calabrese testified that all three entrances into the house were locked, and all the windows were covered, prohibiting him from looking inside. Based on the limited information that was relayed by the caller, he did not force entry into the house.

{¶7} On February 26, 2016, at 7:40 a.m., a call was received at Fairview Hospital's switchboard from an unknown male caller stating that there was a "dead corpse at 4509 West 221st Street" and "someone needs to go get her." The call was transferred to security, who was again told by the unknown male caller that, "someone is dead at 4509 West 221st Street," and "someone needs to go get her." The caller then hung up. The call was not relayed to Fairview Park police until approximately 1:00 p.m. that same day. The call was played for the jury.

{¶8} Christina Langshaw ("Langshaw"), a licensed social worker at MetroHealth Medical Center, testified that she called Fairview Park police after she received a telephone call around 11:00 a.m. on February 26, 2016, from an unknown male caller.

After confirming that she knew Lynita, the caller stated that "somebody needs to go check on her; she's in really bad shape." Langshaw told police that Lynita was her regular patient, who was very sick, and whom she had not heard from in a couple of weeks. Langshaw asked if the police would do a welfare check on Lynita and call her back with an update. Langshaw later identified the voice of the caller as Bey's.

{¶9} Paul Shepard ("Shepard"), a Fairview Park police lieutenant, testified that he was advised of Langshaw's call. He stated that Officers Manuel and Daniel Levy ("Levy") and members of the fire department were dispatched to conduct the welfare check. Shepard, aware of the prior welfare check, instructed his officers to use force, if necessary, to gain entry into the residence.

{¶10} Officer Levy testified that there was no response when they knocked at the door, which was locked. After forcing the door open, they entered the home and found a deceased female, later identified as Lynita, on the floor of a half-bathroom located on the first floor of the residence. According to Officer Levy, there was no indication of foul play, and no one else was present in the home. Detective Mark Miller testified that as he photographed the scene he discovered unopened mail addressed to "Jamal Bey."

{¶11} Fairview Park Fire Lieutenant, Jeff Reimer, testified that he also responded with police to conduct the welfare check. According to Lieutenant Reimer, no forced entry was required to the side entrance of the residence; the door was unlocked.

{¶12} Shepard was notified of the discovery and he treated Lynita's death as "suspicious." He stated that this was not his first interaction with Lynita. Over a

continuing objection, Shepard testified that in 2013, he investigated an incident where Lynita called 911 and was hospitalized. Based on his experiences of handling over 100 cases of domestic violence and assault, he opined that Lynita's version of events — that she fell down the stairs — was inconsistent with her injuries of both eyes swollen shut, stitches to one eye, bruising to her face with clear finger marks on the side of her face, broken ribs, and an internal injury to her face that required surgery.

{¶13} Shepard stated that as part of this 2013 investigation, he visited Lynita's residence, which she shared with Bey. He inspected the stairwell where the incident had allegedly occurred. Shepard stated that based on Lynita's injuries and the condition of the stairwell, there were no signs indicating she fell. He stated he examined the remainder of the home and discovered blood stains in various areas, and Luminol testing revealed there had been blood on the floor that someone had attempted to clean.

{¶14} Shepard testified that during this 2013 investigation, he also interviewed Lynita's children because they were present when she placed the 911 call. Based on that discussion, he learned that the children only heard the incident because they were hiding in the closet. He further testified that criminal charges would have been pursued, but Lynita was not cooperative.

{¶15} Over a continuing objection, Shepard also testified about an incident in 2015 where Lynita was locked out of her residence, even though Bey was found inside the home. According to Shepard, Lynita was much thinner than before, and he observed that she had an injury to her right eye; she declined medical assistance. He testified about a

conversation he had with Bey on this day, where he suggested counseling. Shepard stated that he did not accuse Bey of anything and the conversation was not threatening, but explained to him that based on his observations and Lynita's prior hospitalization, if something happened, it would be fully investigated.

{¶16} Shepard then told the jury about his investigation regarding the circumstances surrounding Lynita's death. He stated he requested Lynita's medical records, subpoenaed phone records, obtained 911 recordings, and interviewed family members, and medical personnel.

{¶17} Shepard testified that he contacted Bey on March 1, 2016, asking him about the last time he spoke with Lynita. The recorded call was played for the jury. During the call, Bey stated he was currently on the road — he was a truck driver — but immediately told Shepard that he was the one who called the police on February 23 because Lynita was "doing very bad; she was ill." However, Bey stated that he did not "think she was going to die." He told Shepard that he found out about Lynita's death from her father and stepmother. Bey explained that when he left on Monday to go work, Lynita was sitting on the bathroom floor. He stated that she had fallen in the bathroom over the weekend, he had to help her walk around, and she was very ill. Despite her physical limitations, Bey stated he believed she was just "faking it" because "maybe she did not want to work."

{¶18} Bey told Shepard that he became concerned when Lynita did not answer her phone and never called him, which was unlike their routine where they would constantly

talk on the phone while he was on the road. Shepard told him that the police conducted a welfare check, but did not force any entry because the severity of the situation was not presented to them. Bey responded that he never thought she would die and "maybe if you would have went [into the residence when he called], she would still be alive." Bey denied doing "anything" to Lynita and said he loved her. He reminded Shepard that he and Lynita had been together for eight years and that he was the only father her kids knew. When Shepard asked Bey to come see him when he arrived back in town, Bey questioned why. And when Shepard asked him about getting his belongings from the home, Bey stated that he was not sure if he wanted to come back to the area.

{¶19} About 20 minutes after the first call ended, Bey called Shepard to "make sure his name was clear" and that he was not being implicated because he did not do "anything foul to her." He stated that based on the 2015 investigation, he knew he was "under the spotlight." Shepard advised him that the investigation was still pending and that he was waiting for the coroner's report.

{¶20} Shepard stated that he knew Lynita was very sick. Bey stated that he did not know that Lynita was "that sick," but said that she fell out of the shower over the weekend and he had to help her walk around. He reiterated that he believed she was just faking it. However, he stated that he never would have left had he known that she was that sick because "they only had each other." Bey stated that he "never expected her to be dead." Without any prompting, he admitted that he did not tell Langshaw who he was when he called her. Again, after Shepard asked him about getting his belongings from

the house, Bey responded that he has "never seen a dead body," and that he does "not go back into a house where someone died." The call was played for the jury.

{¶21} The following morning, on March 2, 2016, Bey again called Shepard, inquiring this time whether he had been criminally charged. Shepard told him he had not, but the investigation was still pending. Bey asked about Lynita's cause of death, because he "was told it was pneumonia." Shepard told him he was still waiting for the coroner's report. Bey reiterated how ill Lynita was and that he had to help her walk around the house because she would fall "all over the place." He stated he last spoke to Lynita on Monday, February 22 around 11:00 a.m. before he left for work. He stated that she told him she would be fine and that he locked the door behind him. Bey again told Shepard that after she did not answer the phone or call him, he became suspicious and called Fairview Park police on February 23 to check on her. He then stated that he called Langshaw on February 26, and only later found out from Lynita's father and stepmother that Lynita had died. He claimed that he was in Texas during this time. This recorded call was played for the jury.

{¶22} Following this conversation, Shepard learned that Bey was in Ohio on February 26, based on where his cell phone "pinged." He further learned that Bey did not learn of Lynita's death from her family. Shepard testified that he also came into possession of an audio recorder that Lynita's sisters found in the residence. At that point, Shepard's investigation started revealing a different picture, and Bey became a person of interest.

**{¶23}** On May 10, 2016, Shepard called Bey to advise him that the coroner had ruled Lynita's death a "homicide" with the cause of death being "pneumonia, dehydration, and kidney failure due to acute trauma." Bey asked Shepard if he believed he caused her death because Lynita had a "fatal disease." Shepard stated that he knew she had HIV. Shepard also advised Bey that they found the digital recorder in the home, and accordingly, he knew that Lynita was alive when Bey left on February 22, and that Bey had called her approximately 15 times on the home phone line. Bey admitted that he left the audio recorder on because "a lot of strange stuff was going on; strange behavior." Shepard also advised Bey that he knew Bey was at the house the morning Lynita was found because his cell phone pinged from the tower nearby. Bey did not deny this fact. Shepard then told Bey that he knew he had called Fairview Hospital reporting a "corpse."

**{¶24}** Bey explained that he did not call the police because when he called before, he believed the police did not respond. He felt that based on prior conversations with Shepard, he would be implicated in her death. Bey stated that Lynita fell "so many times" — out of the shower and from the top of the stairs. He stated he he did not want to leave her, but he "had to work."

**{¶25}** Shepard told Bey that testing at the home only revealed DNA from him and Lynita. Bey reiterated that he would never do anything to Lynita because he "loved her" and he would not want "to jeopardize his own life." Shepard reassured him that he believed that Lynita's death was "not an intentional act," but then explained to Bey that he (1) knew where Bey had been during February 22-26 because of his cell phone

tracking, (2) knew that he called Fairview Park police, Fairview Hospital, and Langshaw, (3) knew that he was in the house the day that Lynita was found, (4) found the photos on Lynita's cell phone, and (5) found the audio recorder that had 17 hours of audio recording. Shepard told Bey, "she never left that bathroom floor," where Bey had left her. According to Detective Shepard, Bey was now a suspect in Lynita's death, and as such, was indicted for her murder. Bey was arrested in July 2016.

{¶26} Darsa Johnson, Lynita's sister, testified that she moved in with Lynita and Bey in 2009 when she was pregnant with her daughter. Johnson stated that she and Bey got into an argument in December 2009, that ultimately led to Lynita asking her leave in January 2010. Johnson admitted that although the argument was heated, it never became physical.

{¶27} Johnson recalled another incident in March 2011, when she and Lynita were celebrating a birthday at Lynita's home. When Bey arrived home, he became upset, and Johnson and Bey had an argument about her birthday celebration and religious beliefs. The argument ended when Bey told her that she needed to leave. Johnson testified that while she was waiting for her ride, Bey came downstairs and "got in" her face. Johnson stated after this, she did not see Lynita until 2013 when their mother was dying.

{¶28} Johnson also testified that she visited Lynita when she was hospitalized in 2013. She observed Lynita with bruising to face, including two blackened eyes. Lynita told her that she fell down the stairs, denying that Bey caused the injuries. Johnson said she did not believe Lynita because she could not comprehend how she received all those

tiny bruises to her face from falling down the stairs. However, Johnson admitted that during this time, Lynita was in a general weakened condition due to HIV, had difficulty walking, and would suffer falls due to hip dysplasia. Johnson testified that she asked Lynita's son if Lynita actually fell down the stairs. According to Johnson, Lynita's son told her that "daddy hit mommy." Johnson stated that Lynita's children called Bey "daddy." Johnson also testified that because of the injuries Lynita sustained, children and family services removed Lynita's children from the home. Johnson stated that children services also did not believe Lynita fell.

{¶29} Johnson also testified about an incident in 2015 where Lynita was locked out of her residence. Johnson testified that Lynita told her that she locked herself out of the house, and the police were called. Johnson stated that she observed Lynita with an abrasion or welt under her eye, which Lynita said was caused by her rubbing her eye.

{¶30} Johnson further testified about another incident in 2015 when she saw Lynita hospitalized with multiple staples in her head and was being treated for C-diff. Lynita maintained that she had fallen. Johnson recalled another occasion in late 2015, when she took Lynita grocery shopping and Lynita had a black eye, which she claimed to have gotten when she fell up the stairs and hit her eye on the doorknob.

{¶31} Melissa Jones ("Jones"), Lynita's older sister, testified that she had a great relationship with her sister back in 2010, but Lynita "got weird" and would only let her visit occasionally. Jones testified about a telephone conversation she had in August 2012, with Lynita where Bey yelled at Jones. After this incident, Jones tried to call her

sister and found that her number had been changed. She stated she tried to go visit, but Lynita would not let her in. Jones testified that the next time she saw Lynita was at her grandmother's house in 2012, when Jones observed a huge bruise on Lynita's face that allegedly occurred when she ran into a cupboard.

{¶32} Jones testified that she also saw her sister at Fairview Hospital in 2013. She observed bruising to Lynita's face and an injury to her eye. Jones testified she was concerned because she saw knuckle marks on Lynita's face and lumps on her forehead. She stated that Lynita told her that she fell down the stairs. According to Jones, she was not satisfied with that explanation. She testified that she took photos of Lynita and her injuries; the jury viewed these photographs. She admitted, however, that Lynita denied that Bey caused her injuries. When Lynita was released from the hospital, she stayed with Jones for three weeks, before returning home with Bey. Jones testified that after Lynita's death, as she was cleaning Lynita's home, she found a tape recorder that she turned over to police.

{¶33} Carol Williams ("Williams"), Lynita's aunt, testified that she spoke with Lynita on February 19, 2016, on the phone. According to Williams, Bey took the phone from Lynita and "went on a rage," telling Williams to stop sending Lynita money, to not associate with Lynita anymore, and that Lynita was making up her injuries and was lazy.

{¶34} Langshaw, Lynita's HIV case manager at MetroHealth Hospital, testified she first met Lynita in 2005. She stated that in 2009, Lynita had been compliant in taking her medication, but she started demonstrating noncompliant behavior in 2011, and

her demeanor continued to change into 2012, with Lynita becoming untrusting of people and telling Langshaw that she thought HIV was a manufactured disease. Lynita was only compliant with her medication when she was out of her home, either in the hospital or at the nursing home. Langshaw also testified that Lynita's 2013 hospitalization caused her suspicion based on the type of injury to her face. She described how she would counsel Lynita about cooperating with the police, getting a restraining order, or going to a shelter. According to Langshaw, Lynita was fearful but always maintained that she fell. It was around this time that Langshaw first learned of Lynita's relationship with Bey, and in 2015, Langshaw noticed a decrease in Lynita's visits. She stated her last conversation with Lynita was in the beginning of February 2016 about her noncompliance with medication.

{¶35} Dr. Melissa Osborn Jenkins ("Dr. Jenkins), Lynita's infectious disease physician at MetroHealth Medical Center, testified that she treated Lynita from 2012-2016 and saw her 18 times. She testified regarding Lynita's ailments as a result of her HIV disease and the medications she was taking. She stated that Lynita had difficulty walking due to her ongoing hip dysplasia. Dr. Jenkins testified that Lynita's medications, if taken properly, would cause long-term effects on Lynita's bone density and kidneys. She stated that Lynita's failure to take her medications would result in a weakened immune system. Dr. Jenkins testified that she last saw Lynita on February 3, 2016, at which time she was very thin. They discussed the importance of taking her medicine, and Lynita agreed to start taking it again.

**{¶36}** Dr. Thomas Gilson ("Dr. Gilson"), Cuyahoga County Medical Examiner, determined Lynita's primary cause of death was pneumonia, resulting in dehydration and injury to the kidneys due to blunt impacts. He also listed her HIV disease as a contributing factor due to a weakened immune system. He testified that after the police discovered the audio recorder, he estimated that Lynita passed away on February 24, 2016.

**{¶37}** Dr. Gilson testified that upon an external examination of the body, he observed blunt force injuries, abrasions, lacerations, and contusions. He observed two lacerations on Lynita's head, with bruising in the tissue of the scalp, bruising on her face, lips, and mouth, numerous bruises that covered most of her entire back, at least 35 separate impact wounds on her back, bruising and abrasions on her hips, both arms and both legs, and bruising on the top of her shoulders and near her armpits. Dr. Gilson admitted that he could not identify the specific mechanism that caused the blunt force injuries, but maintained that the injuries were the result of multiple blunt force impacts and inconsistent with a fall due to the distribution of the injuries. Dr. Gilson stated that many of the injuries were incompatible with a person falling, because when people fall, it is not typical to hit recessed areas of the face or eyelid, or fall onto the back of the hands. Furthermore, he stated that it is not typical to get bruises to the inside of the arms, describing them as "grasp contusions." Dr. Gilson testified that the bruises on Lynita's back were in areas that individuals do not routinely bruise when they fall, and that it is uncommon to fall and injure both sides of the body.

{¶38} Dr. Gilson testified that the internal examination revealed acute left and right rib fractures, healed left rib fractures, a large hemorrhage in the retro peritoneum, and bacterial pneumonia. He explained that bacterial pneumonia is not typically associated with HIV, but that broken ribs could lead to shallow breathing that could cause bacterial pneumonia.

{¶39} In his defense, Bey presented Dr. James Robert Pritchard ("Dr. Pritchard"), an expert in forensic medicine. He disagreed with Dr. Gilson's cause of death, opining that the cause of death should have been "acute pneumonia as a consequence of AIDS-HIV, Stage 3, AIDS encephalitis, wasting syndrome, cachexia, non-adherence to taking prescribed medication, non-compliance with medical care, old rib fractures, and new old rib fractures." Dr. Pritchard stated that he would have listed schizotypal psychiatric disorder, depression, hypotension, cigarette smoking, chronic pain syndrome, bilateral hip dysplasia, and chronic narcotic use as contributing factors. He believed that many of the medications that Lynita was taking could have caused ease of bruising, weakness, dizziness, and fatigue. He stated that Lynita had toxoplasmosis and encephalitis in the brain, which could cause problems with walking and balance. Dr. Pritchard disagreed with Dr. Gilson's opinion that Lynita suffered an acute injury to the kidney and that blunt force injuries caused her death, stating "[n]one of these injuries are lethal" — Lynita's injuries could have resulted from falls. Dr. Pritchard opined that based on Lynita's advanced stage of HIV and other ailments, her manner of death should have been ruled "undetermined."

{¶40} The jury found Bey not guilty of renumbered Count 1, murder, but found him guilty of all the remaining counts — felony-murder (renumbered Count 2) in violation of R.C. 2903.02(B); felonious assault (renumbered Count 3); involuntary manslaughter (renumbered Counts 4 and 6) in violation of R.C. 2903.04(A) and (B); failing to provide for a functionally impaired person (renumbered Count 5), in violation of R.C. 2903.16(A); domestic violence (renumbered Count 7), in violation of R.C. 2919.15(B); and assault (renumbered Count 8), in violation of R.C. 2903.13(A). The trial court merged all counts for sentencing, and the state elected to proceed to sentencing on renumbered Count 2, felony-murder. Bey was sentenced to 15 years to life in prison.

{¶41} This appeal follows and five assignments of error have been presented for our review.

## I.  Other Acts Evidence

{¶42} Bey filed a motion in limine to exclude any evidence relating to other crimes, wrongs, or bad acts after being apprised that the state intended to introduce other acts evidence. On the first day of trial, the court conducted a hearing on whether Bey's prior acts would be admissible. The state presented to defense counsel and the trial court a written notice of its intention to introduce other acts evidence pursuant to Evid.R. 404(B). The notice was not filed, but no argument was raised by Bey to the trial court that he was not aware of the state's notice or that he was prejudiced or surprised by the state's intention.[1]

---

[1]Based on assurances the state made at oral argument, this court, sua sponte requested that the

{¶43} The state's notice of intent provided that its purpose for introducing Evid.R. 404(B) evidence was for proving "intent, knowledge, and absence of mistake or accident." The notice asserted throughout that the death of Lynita was not an accident. The state argued that it intended to present evidence of Lynita's 2013 hospitalization, and the 2015 investigation where Lynita was locked out of the house, as the Evid.R. 404(B) other acts evidence to prove that Lynita's death was not accidental. Although the state maintained that the two prior allegations of domestic abuse were admissible to prove "intent, knowledge, and absence of mistake or accident," the state focused on the absence of mistake or accident as its basis for admissibility.

{¶44} Bey argued that in both 2013 and 2015, Lynita denied that she was assaulted by anyone, including him. Therefore, according to Bey, the state was attempting to offer evidence of allegations of crimes that did not occur. Bey alleged that Lynita's injuries were the result of accidental falls she sustained prior to her death. His defense was that he did not cause these injuries — injuries that according to Dr. Gilson contributed to her death. Bey maintained that no crime occurred in this case, and thus, the state's attempt to use Lynita's prior injuries to prove that the injuries that caused her death were at the hands of Bey was improper. Bey further objected stating that if the evidence was admitted, it would be unfairly prejudicial because the jury would undoubtedly conclude that Bey had a propensity for assaulting Lynita.

state supplement the appellate record with the purported file-stamped copy of the pretrial notice. The state subsequently advised this court that the notice was never filed with the trial court. The notice was supplemented in the appellate record.

**{¶45}** The trial court allowed the prior acts to be presented, finding that the state satisfied its

> burden of showing that the purpose of the evidence, it is not overly prejudicial to the [d]efendant, and there are other cases that indicate that people's observations of somebody is important over a period of time. And people who observed this information and, unfortunately, sometimes its only when the last bit of the information comes into play that you get the whole picture.

(Tr. 15-16.)

**{¶46}** In his first assignment of error, Bey challenges the trial court's decision allowing other acts evidence. He also contends that other evidentiary violations stemming from the Evid.R. 404(B) ruling caused extreme and undue prejudice to him. Specifically, he contends that witnesses were allowed to give opinion and hearsay testimony, which violated his right to confrontation.

**{¶47}** "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime, or that he acted in conformity with bad character." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15. However, there are exceptions that allow other acts of wrongdoing to be admitted.

**{¶48}** R.C. 2945.59 provides that:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

Additionally, Evid.R. 404(B) provides that evidence of other crimes, wrongs, or acts is permitted to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident.

{¶49} In deciding whether to admit other acts evidence, trial courts should conduct a three-step analysis:

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B).

The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.

*Williams* at ¶ 20.

**{¶50}** On appeal, Bey contends that the state's use of the circumstances surrounding Lynita's 2013 hospitalization and the investigation in 2015 was improper for the stated purpose of showing absence of mistake or accident.

> When the purpose of other acts is to show the absence of mistake or accident on the part of the defendant in committing the offense charged, it must be shown that a connection, in the mind of the defendant, must have existed between the offense in question and the other acts of a similar nature. *See State v. Moore*, 149 Ohio St.226, 78 N.E.2d 365 (1948). The other acts of the defendant must have such a temporal, modal and situational relationship with the acts constituting the crime charged that the evidence of the other acts discloses purposeful action in the commission of the offense in question. The evidence is then admissible to the extent it may be relevant in showing the defendant acted in the absence of mistake or accident.

*State v. Burson*, 38 Ohio St.2d 157, 159, 311 N.E.2d 526 (1974); *see also State v. Murphy*, 8th Dist. Cuyahoga No. 70400, 1997 Ohio App. LEXIS 1328, 11 (Apr. 3, 1997).

**{¶51}** Bey relies on *State v. Davis*, 7th Dist. Columbiana No. 94-CO-12, 1995 Ohio App. LEXIS 4182 (Sept. 26, 1995), as support for his argument that the meaning of "accident" in terms of admissibility of other acts evidence does not encompass the state's intended use of showing that Lynita's death was not accidental. In *Davis*, the court stated

> The accident referred to in [Evid.R. 404(B) and R.C. 2945.59] is an accidental act on the part of the defendant which results in * * * [the injury or death of another]. It is more or less a situation of confession and avoidance. The defendant admits that he or she was involved in the act

which caused the death of another or caused the commission of some crime, but presents evidence that it was purely accidental and not in any way intended.

*Id*. at 6.

**{¶52}** In *Davis*, the defendant intended to establish that the death of the infant was a result of the infant accidentally falling down the stairs and onto the floor. To refute this theory, the state wanted to present evidence of the defendant's other acts that suggested the defendant physically abused the child on prior occasions. The appellate court found that the trial court abused its discretion in allowing the state's evidence because the defendant did not admit that she had anything to do with the death of the infant. Bey contends that just like in *Davis*, he denied culpability in Lynita's death.

**{¶53}** The state, however, relies on *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, where the defendant claimed that the child died during an accidental fall down the stairs. Evidence of the child's prior injuries, where the defendant explained that the injuries were caused as a result of him falling with the child, were deemed admissible as other acts evidence because they were relevant in rebutting the defendant's claim that the child died in an accidental fall. *Id*. at ¶ 114. The Ohio Supreme Count found that the earlier incidents were similar to the incident in the underlying charge. *Id*.

**{¶54}** Based on the evidence in the record, we find that evidence of the 2013 hospitalization and the 2015 investigation was not admissible to show the absence of mistake or accident on the part of Bey in committing felony-murder. Admission for this

purpose focuses on Bey's conduct and whether the prior acts show that Bey acted purposefully, rather than accidentally or mistakenly, in committing the current offense. Like the defendant in *Davis*, Bey denied any culpability in Lynita's death. And unlike in *Hunter*, Bey never explained on those prior occasions that Lynita's injuries were caused by an accident; Lynita made such assertions. Therefore, the use of prior acts to show "absence of mistake or accident" was not proper because Bey did not admit to any criminal conduct and then attempt to claim the resulting injury or death was accidental or caused by mistake. *See Davis* at 6. The trial court should not have allowed the evidence for this purpose.

{¶55} Even though the 2013 hospitalization and the 2015 investigation were inadmissible to prove absence of mistake or accident, the jury was instructed that it could consider other acts evidence to prove knowledge or identity. Although identity was not one of the bases upon which the state premised its notice of intent to use Evid.R. 404(B) evidence, the jury was given an instruction that allowed it to consider other acts evidence for other purposes —

> (A) absence of mistake or accident; or (B) the defendant's motive, opportunity, intent; or (C) purpose, preparation, or plan to commit the offense charge in this trial; or knowledge of circumstances surrounding the offense charge in this trial; or (D) the identity of the person who committed the offense in this trial.

(Tr. 1066.) No objection was raised regarding this jury instruction, and no argument has been raised on appeal that the instruction was improper.

**{¶56}** In this case, multiple witnesses testified about the circumstances and observations involving Lynita's hospitalization in 2013 and the 2015 investigation. Shepard testified that based on his experiences of handling over 100 cases of domestic violence and assault, he opined that Lynita's version of events — that she fell down the stairs in 2013 — was inconsistent with her observed injuries of both eyes being swollen shut, stitches to one eye, bruising to her face with clear finger marks on the side of her face, broken ribs, and an internal injury to her face that required surgery. Lynita's sisters each testified that they did not believe her explanation that she fell down the stairs, or that she rubbed her eye too hard, causing it to welt. However, they stated that Lynita denied that Bey caused her injuries. It is clear that the witnesses all insinuated that Bey caused the injuries in 2013 and 2015, and the jury could have inferred that Bey was accused of causing the injuries Lynita sustained.

**{¶57}** The only direct testimony connecting Bey to Lynita's prior injuries for "other acts" was based on inadmissible hearsay testimony. Darsa testified over objection that when she asked Lynita's son if his mom fell down the stairs, Lynita's son told her that "daddy hit mommy." Shepard also testified over objection that criminal charges would have been brought against Bey in 2013, but Lynita was uncooperative. He further testified that he interviewed Lynita's children because they were present during the 2013 "event that led Lynita to the hospital." He testified that "they heard it. They hid in the closet."

**{¶58}** Dr. Gilson testified that Lynita's manner of death was homicide, with one of the causes of death as "blunt impacts" to her body. He stated that Lynita's injuries were "inconsistent with a fall," and opined that Lynita "was assaulted by person(s) unknown." The jury heard testimony that there was no sign of "foul play" when the officers discovered Lynita on the bathroom floor on February 26, 2016, and the only other DNA discovered in the house was Bey's.

**{¶59}** In the recorded telephone calls played for the jury, Bey admitted that he left Lynita lying on the bathroom floor on February 22, she never answered his telephone calls, and he found her deceased on February 26. The other acts evidence — the 2013 hospitalization and the 2015 investigation — where the injuries Lynita sustained were also not consistent with a fall, was relevant to prove that Bey was the "unknown person" who committed the "assault" and that he had knowledge of the circumstances surrounding the offense charge. Therefore, we find that the court did not abuse its discretion in admitting the testimonial evidence surrounding Lynita's 2013 hospitalization and the 2015 investigation because it was offered for a valid purpose under Evid.R. 404(B).

**{¶60}** Finding that the other acts evidence was offered for a valid purpose under Evid.R. 404(B), we still consider whether the evidence is substantially more prejudicial than probative. *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20. Undoubtedly the testimony was prejudicial, but in the context of the entire trial and the other admissible evidence, including Bey's admissions and conduct surrounding

Lynita's death, the testimony does not render the evidence substantially more prejudicial than probative.

**{¶61}** Finally, even assuming the trial court abused its discretion in admitting the challenged testimony, the error would be harmless. As discussed, other relevant and admissible evidence was presented for the jury to conclude that Bey caused Lynita's death.

**{¶62}** Accordingly, the first assignment of error is overruled.

## II. Admission of Medical Examiner's Verdict

**{¶63}** In his second assignment of error, Bey contends that the trial court abused its discretion in admitting the medical examiner's verdict, which incorporated prejudicial hearsay, into evidence.

**{¶64}** Bey challenges the language in the medical examiner's verdict that states that Lynita "was assaulted by person(s) unknown, then collapsed, and subsequently expired." Bey contends that this conclusion was based on hearsay and provided an opinion as to the guilt of the crime. In support, he cites to *State v. Kinkopf*, 8th Dist. Cuyahoga No. 33991, 1975 Ohio App. LEXIS 6511 (June 5, 1975), that "[a] coroner's verdict is admissible insofar as it reports observations and determinations of physical phenomena personally viewed by the coroner or by those under his supervision. However, those portions which report the factual history leading up to injuries and death are inadmissible for lack of personal observation by the coroner or his agents." *Id*. at 4.

**{¶65}** A coroner is not limited to describing only physical or physiological facts. *State ex rel. Blair v. Balraj*, 69 Ohio St.3d 310, 312, 631 N.E.2d 1044 (1994). Ohio law authorizes a coroner to inquire "how the deceased came to [her] death, whether by violence to self or from other persons, by whom, whether as principals or accessories before or after the fact, and all the circumstances related thereto." R.C. 313.17. Furthermore,

> [w]hen any person dies as a result of criminal or other violent means, by casualty, by suicide, or in any suspicious or unusual manner, * * * the physician called in attendance, or any member of an ambulance service, emergency squad, or law enforcement agency who obtains knowledge thereof arising from the person's duties, shall immediately notify the office of the coroner of the known facts concerning the time, place, manner, and circumstances of the death, and any other information that is required pursuant to sections 313.01 to 313.22 of the Revised Code.

R.C. 313.12.

**{¶66}** As such, "[t]he cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death." R.C. 313.19; *Vargo v. Travelers Ins. Co.*, 34 Ohio St.3d 25, 516 N.E.2d 226 (1987), paragraph one of the syllabus ("coroner's factual determinations concerning the manner, mode, and cause of the decedent's death, as expressed in the coroner's report and death certificate, creating a nonbinding rebuttable presumption concerning such facts in the absence of competent, credible evidence to the contrary").

**{¶67}** Thus, it is recognized that "'it is clearly within the expertise of the coroner to give an opinion on whether the death is a homicide.'" *State v. Jones*, 8th Dist. Cuyahoga Nos. 103290 and 103302, 2016-Ohio-7702, ¶ 65, quoting *State v. Simpson*, 11th Dist. Lake No. 93-L-014, 1994 Ohio App. LEXIS 4472, 21 (Sept. 30, 1994), citing *State v. Harrison*, 1st Dist. Hamilton No. C-920422, 1993 Ohio App. LEXIS 2446 (May 12, 1993).

**{¶68}** In this case, Dr. Gilson's report does not identify who is criminally responsible for the Lynita's death. The challenged language "assaulted by persons unknown" does not render an expert opinion that implicates Bey. Moreover, at no point during Dr. Gilson's testimony did he opine that Bey caused Lynita's injuries. *See State v. Stewart*, 11th Dist. Ashtabula No. 2001-A-0011, 2002-Ohio-3842, ¶ 46 (the coroner's testimony regarding the decedent's cause of death was not prejudicial because it concluded only that her "death was caused by another person, as opposed to suicide and natural causes, and no criminal responsibility was assigned to appellant"); *State v. Cohen*, 11th Dist. Lake No. 12-011, 1988 Ohio App. LEXIS 1618 (Apr. 29, 1988) (coroner's testimony concluding that the victim's death was the result of violent means was admissible because there was no testimony implicating the defendant in the victim's death).

**{¶69}** Moreover, Dr. Gilson testified, without objection, that Lynita's manner of death was "homicide, meaning that she died at the hand of another person, because these injuries are not accidental; they're inflicted" (tr. 630); "ruled [as] a homicide because

these blunt impact injuries are consistent with somebody beating her. They're not consistent with somebody who is falling." (Tr. 670.) Therefore, the admission of the exhibit making the same assertions was harmless error.

**{¶70}** Finally, the language that Bey complains about on appeal was also found in the Ohio Department of Health Vital Statistics Supplementary Medical Certification, which was admitted into evidence as defendant's exhibit C, and presented to the jury for consideration during deliberation. In this exhibit, Section 33f requests: "Describe How Injury Occurred." The answer provided: "Was Assaulted By Person(s) Unknown." Accordingly, any error in admitting the Medical Examiner's Verdict containing that same information would be harmless, at best.

**{¶71}** Accordingly, Bey's second assignment of error is overruled.

### III. Sufficiency of the Evidence

**{¶72}** The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence is to consider all of the evidence admitted at trial, *even if the evidence was improperly admitted.* (Emphasis added.) *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶19. "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'"

*State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-829, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus

**{¶73}** It is well established that "'circumstantial evidence is sufficient to sustain a conviction if the evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 75, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990). Circumstantial evidence is proof of facts or circumstances by direct evidence from which the trier of fact may reasonably infer other related or connected facts that naturally or logically follow. *State v. Beynum*, 8th Dist. Cuyahoga No. 69206, 1996 Ohio App. LEXIS 2143 (May 23, 1996).

**{¶74}** In his third assignment of error, Bey contends that the "state presented insufficient evidence of [his] guilt to any offense."[2] He contends that insufficient evidence was presented that he caused Lynita's death because "no witness testified at any time that they saw him commit any act of violence or neglect, except [being] absent from the home the weekend of her death and [the improper way] he presented her death to authorities." He contends the evidence that convicted him was based on improper and inadmissible Evid.R. 404(B) evidence, and Dr. Gilson's determination that the manner of death was homicide based on his opinion that there were too many injuries inconsistent

---

[2]We need not address the finding of guilt regarding the felonious assault, involuntary manslaughter, failing to provide for a functionally impaired person, domestic violence, and assault charges in renumbered Counts 3, 4, 5, 6, 7, and 8 because those offenses merged with the felony-murder offense in renumbered Count 2, and the state elected that Bey be sentenced on Count 2. *See State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14.

with a fall.  He also contends that Dr. Gilson's "more likely than not" standard that Lynita was assaulted did not equate to proof beyond a reasonable doubt.

**{¶75}** Bey was convicted of felony-murder, in violation of R.C. 2903.02(B), which prohibits any person from causing "the death of another as the proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree."   Bey's conviction for felony-murder was predicated on felonious assault, presumably in violation of R.C. 2903.11(A),[3] which prohibits a person from knowingly causing or attempting to cause serious physical harm to another.

**{¶76}** The following instructions regarding "cause" were given to the jury:

Cause.  The State charges that the act or failure to act of the Defendant caused death.

Cause is an essential element of the offense.  Cause is an act or failure to act, which in the natural and continuous sequence, directly produces the death to a person, and without which it would not have occurred.
Natural consequences.  The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act or failure to act.  The Defendant is also responsible for the natural and foreseeable consequences or results that follow in the ordinary course of events from the act or failure to act.

Other causes not a defense.  There may be one or more causes of an event; however, if the Defendant's act or failure to act is one cause, then the existence of other causes is not a defense.

---

[3] We note that in both the indictment and the jury instructions, indicted Count 3 (renumbered Count 4), identifies that the predicate offense of felonious assault was in violation of "R.C. 2903.02."  The jury was properly instructed, however, regarding the elements of felonious assault when the court instructed the jury on indicted Count 4 (renumbered Count 3), felonious assault.   No argument has been raised on appeal challenging the indictment itself or the jury instructions given.

Intervening causes. The Defendant is responsible for the natural consequences of the Defendant's unlawful act or failure to act, even though the death of Lynita McCaslin was also caused by the intervening act or failure to act of another person or agency.

Independent intervening cause. If the Defendant inflicted an injury not likely to produce death and if the sole and only cause of death was natural cause or fatal injury inflicted by another person, the Defendant who inflicted the original injury is not responsible for the death.

{¶77} Viewing all the admitted evidence in the light most favorable to the state, sufficient evidence was presented that Bey caused the death of Lynita. The jury heard the testimony of Lynita's sisters that on prior occasions, she had bruising to her face and body, claiming she fell down the stairs or that her injuries were caused by her hitting or falling into something. Her sisters stated that although Lynita denied that Bey caused the injuries, they did not believe her, and even Lynita's son stated "daddy hit mommy." Shepard also testified that based on his experiences and observations, Lynita's injuries were not consistent with falling.

{¶78} This testimony, when viewed with Dr. Gilson's opinion that Lynita's injuries at the time of her death were not consistent with falling, but were intentionally inflicted, allowed the jury to infer that Bey caused Lynita's injuries. Despite Bey's challenge that Dr. Gilson's opinion was given on a "more likely than not" standard, Dr. Gilson testified to a reasonable degree of medical certainty that Lynita's manner of death was homicide, caused partially by "blunt impacts" at the hands of another.

{¶79} The jury also heard from Bey himself through the playing of the recordings from the audio recorder discovered in the home and through the recorded phone calls. In

the audio recording found in the residence, the jury heard the interaction between Bey and Lynita prior to him leaving. The jury considered that Bey abandoned Lynita, who was lying on a bathroom floor covered in urine and blood, and clearly could not get up on her own. Additionally, the jury heard Bey come back to the home, pound on the door, and even though Lynita did not answer the door, Bey left the residence without attempting to gain entrance in the house.

{¶80} Shepard testified about Bey's whereabouts from February 22 to 26 based on his cell phone activity. Bey called the house phone at least fifteen times on February 22, but apparently was not alarmed when Lynita did not answer the phone. This was inconsistent with Bey's account of how he and Lynita would talk constantly while he was driving. It was not until the following day that he contacted the police requesting someone check on her. Even when he called, he indentified himself a "friend," and refused to give his name or gave the police a fictitious name. Bey did not ask for the police to return his call to give him a status report, and he did not attempt to call Lynita again after his final call on February 23 at 2:50 p.m.

{¶81} The jury considered that Bey returned home on February 26 and found Lynita dead in the bathroom, exactly where he left her four days earlier. And despite Bey stating that the two of them were together for eight years, they were "all each other had," and her children called him "dad," Bey abandoned Lynita and anonymously called the police to report a "corpse." Finally, the jury heard Bey being untruthful with Shepard

regarding how he learned about Lynita's death. And despite Bey telling Shepard that Lynita was extremely ill, the jury also heard Bey believed she was faking it.

{¶82} Based on the instructions given, the jury did not have to find beyond a reasonable doubt that Bey's overt actions caused Lynita serious physical harm that ultimately caused her death. Rather, the instruction also allowed the jury to find that Bey's *failure to act* caused Lynita serious physical harm that ultimately resulted in her death. It was undisputed that Bey knew that Lynita was extremely ill, and suffered from conditions that caused making her unable to care for herself. Bey admitted to Shepard that Lynita had fallen out of the shower the weekend before he left, and that "she was falling all over the place." He told Shepard that he had to help her walk around the house. Even if the jury believed that Bey did not physically cause Lynita's injury, Bey knew of her weakened condition and yet failed to seek medical attention or police attention when she was unresponsive to his phone calls after he left her on February 22.

{¶83} Accordingly, the direct and circumstantial evidence in this case was sufficient to support Bey's conviction for felony-murder; Bey's overt actions or failure to act caused Lynita serious physical harm that proximately caused her death. Bey's third assignment of error is overruled.

### IV. Manifest Weight of the Evidence

{¶84} In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A reviewing court "weighs the evidence and all reasonable

inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶85} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶86} In his fourth assignment of error, Bey contends that this is the exceptional case in which the evidence weighs heavily against the conviction. Other than making the same arguments he raises for sufficiency, he primarily focuses on the competing expert testimony from Drs. Gilson and Pritchard. He contends that Dr. Gilson did not take into

account Lynita's HIV advancement and weakened condition due to her medications. Bey maintains that based on Dr. Pritchard's expert opinion that Lynita suffered from a variety of ailments, it was not possible to determine the cause of her death. Because of the competing expert testimony and the fact that no one testified to witnessing Bey assault Lynita, Bey contends that the jury lost its way in finding him guilty of felony-murder.

{¶87} In this case, we cannot say that the jury lost its way simply because it chose to believe Dr. Gilson instead of Dr. Pritchard. The jury was able to assess the credibility of all the witnesses who testified at trial, and assess the credibility of Bey through the admitted audio recordings. Based on the record before this court, we cannot say that the jury lost its way or that a manifest miscarriage of justice occurred.

{¶88} Accordingly, Bey's fourth assignment of error is overruled.

### V. Journal Entry of Conviction

{¶89} Bey contends in his fifth assignment of error, and the state agrees, that the trial court incorrectly noted in the journal entry of conviction that "Re-numbered Count(s) 1 was nolled," when in fact, Bey was found not guilty. Accordingly, the case is remanded to the trial court to issue, nunc pro tunc, a corrected journal entry of conviction setting forth that the jury returned a verdict of not guilty of murder, in violation of R.C. 2903.02(A) as charged in renumbered Count 1 of the indictment. The fifth assignment of error is sustained.

{¶90} Judgment affirmed and the case is remanded to the trial court for further action consistent with this opinion.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence and for the issuance of a nunc pro tunc journal entry of conviction.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

KATHLEEN ANN KEOUGH, JUDGE

MARY EILEEN KILBANE, A.J., and
EILEEN T. GALLAGHER, J., CONCUR